18944

The STATE, Respondent, v. John Paul ANDERSON, Appellant.

(169 S. E. (2d) 706)

*Messrs. John W. Williams, Jr. and John W. McIntosh,* of Columbia, *for Appellant,*

*Messrs. Robert B. Wallace, Solicitor, and A. Arthur Rosenblum, Assistant Solicitor,* of Charleston, *for Respondent,*

July 22, 1969.

LITTLEJOHN, Justice.

By a verdict of the jury the defendant, John Paul Anderson, was found guilty with recommendation to mercy of the murder of his wife, Brenda Minton Anderson, by drowning in the ocean at Folly Beach on June 19, 1965. After sentence of life imprisonment was imposed as required by statute, he

appealed from the conviction and sentence by thirty-eight exceptions alleging trial errors on the part of the lower court. In appellant's brief the actual questions involved for determination by this court are reduced to seven.

There is no direct evidence that the defendant drowned his wife. Most of the circumstantial evidence on which the state relies to establish its case is uncontroverted. The prosecution presented over thirty witnesses in developing the facts which are extremely involved. The transcript covers more than 1500 pages.

The dead body of Mrs. Anderson was found late in the day of June 19 in shallow water on the beach approximately one mile from the place where she and the defendant had entered the ocean to swim and dive several hours previously.

It is the contention of The State that she and the defendant went under the water with air tank and other scuba diving equpiment and that the defendant removed the equipment from her and held her under water until she was drowned. The theory of The State is that he drowned her to collect $100,000 from a double indemnity life insurance policy on her life, of which he was beneficiary.

Accordingly, a most important factual issue for determination by the jury was whether the wife was on a small plastic raft when the defendant left the ocean, as contended by him, or whether the raft had floated out to sea without her, as contended by The State.

In summarizing the evidence we follow largely that produced by the prosecution since conflicts have presumably been resolved by the jury in The State's favor.

Defendant on this appeal does not submit that jury issues were lacking. Objections are made to the admissibility of evidence, to alleged prejudicial argument by the solicitor to the jury, to the submission to the jury of the issue of voluntary manslaughter, and to the judge's failure to dismiss the jury before a guilty verdict was rendered.

The defendant, a native of Massachusetts, was twenty-five years of age at the time of the trial and was a seaman in the Navy assigned to a submarine based at Charleston. He was a high school graduate and had served four years in the Navy before entering the University of North Carolina in September 1963, where he remained for one semester. After one semester he left the university and reenlisted in the Navy in February 1964. On April 1, 1965, approximately ten weeks prior to the drowning, he married Brenda Minton Anderson, with whom he resided at a home on Folly Beach.

As indicated, much of the evidence is not in dispute. On the morning of June 19, 1965, between 9:30 and 10 o'clock, the defendant and his wife drove their car to the strand area, unloaded the scuba diving equipment, and went out into the ocean in order that the defendant, who was skilled at scuba diving, could teach his wife the use of the equipment. After testing the equipment the defendant placed it on his wife and the two proceeded well out into deep water with a small inflatable plastic raft described as being about three feet by five feet. It is referred to throughout the trial as a raft. Actually it was more of an inflatable float. The defendant, not wearing any diving equipment, dove under the water two or more times with his wife, who with the use of the equipment was able to breathe. The testimony is conflicting on the question of the whereabouts of the raft after the couple had dived once or twice and after the scuba diving lesson was completed. Three witnesses, who were watching the scuba divers from the beach at the time, testified for the prosecution that the raft had drifted out to sea well beyond the reach of the Anderson couple after their first dive. They stated that the last time the couple dived together only one head came up which proved to be that of the defendant, and stated that nothing further was seen of his wife. The defendant denies this and avers that the raft was with them and that he left his wife in safety on the raft. One of the witnesses reported the disappearance to the police about noon.

After two or more dives the defendant came back to the beach and brought the diving equipment with him. The equipment was left on blankets which he and his wife had placed on the beach.

The defendant left the beach area and drove several miles to a garage in an effort to have his brakes repaired. Later he drove to the Isle of Palms and drank beer with friends. About four o'clock in the afternoon, he returned to the beach and carried the blankets and diving equipment and other personal items, left on the strand by him and his wife, home and began inquiring of his neighbors concerning the whereabouts of his wife.

When the drowned body of Brenda Minton Anderson was recovered from shallow water at about 5:40 p.m. approximately one mile away from the point where she had entered the ocean, there were fingerprint marks on the back of both arms, and she had obviously been dead for some time.

Within an hour after the recovery of her body the defendant went to the police station at Folly Beach to report her disappearance. He was informed that a body has been discovered and shortly thereafter he identified that body as being that of his wife.

To fortify its circumstantial evidence case The State undertook to show an intelligently conceived design by the defendant to find a young girl, insure her life for a large sum of money, marry her, murder her, and collect the insurance proceeds. In so doing, The State sought to show the defendant's repeated pattern of intimate relations with girls, promises of marriage and attempts to procure insurance on their lives.

Timely objections were made by counsel for the defendant to voluminous evidence submitted by The State relative to his conduct several months prior to and up until the death of Mrs. Anderson.

It is the contention of the appellant that the trial judge erred in allowing in evidence testimony: that the defendant

failed to support his illegitimate child; that his conduct was adulterous; that he attempted to extort money from E. J. McGuire; that he was connected with a heroin ring; that he planned to murder; and that he participated in "the great train robbery", these being of a criminal nature. It is also the contention of the appellant that the trial judge erred in allowing in evidence testimony of conduct categorized as noncriminal but which reflected on the character of the defendant. These included such things as false statements made by the defendant relative to his background, financial worth, station in life, naval rank, educational background and affiliation with the CIA and illicit affairs other than adultery.

The first two questions raised by the defendant on this appeal allege error on the part of the trial judge in allowing The State in its case in chief to introduce evidence tending to show the defendant's involvement in separate and independent criminal activities, such as adultery and extortion, and to introduce evidence directly affecting the character and credibility of the defendant, such as the fact that he lied to several girls and insurance agents about his education and financial standing.

Normally evidence of prior crimes is not admissible but The State contends that the evidence submitted comes within certain established exceptions to the general rule.

" 'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish, (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. Wharton on Crim. Ev. (9th Ed.) 48; Underhill on Ev. § 58; Abbott's Trial Brief, Crim. Trials, sec. 598.' " *State v. Lyle,* 125 S. C. 406, 118 S. E. 803, 807 (1923).

Defense contends that evidence of many criminal and noncriminal activities of the defendant is not relevant and highly

prejudicial and constitutes an attack on the defendant's character without his having put it in issue.

It is not denied that the defendant, in December 1964, paid insurance agent Sam Springer of the John Hancock Company an initial premium of $348 on a $50,000 policy of double indemnity insurance on the life of Miss Brenda Minton, to whom he was engaged. The policy was issued on December 17, 1964; her parents were named beneficiaries but they were not aware that the policy was being issued or that they were beneficiaries until they received it in the mail from the John Hancock Insurance Company. A few days after the defendant and Brenda Minton were married the policy was changed so as to make the defendant sole beneficiary. This change of beneficiary took place approximately sixty days before the drowning.

Objection was raised to the introduction of evidence relative to the association of the defendant with Ellen Ketcham and with Janice Hill during several months prior to the issuance of the insurance policy.

As relates to Ellen Ketcham the evidence shows that the defendant met her in early 1964 while she was a student nurse in New York. He told Ellen that he had a Ph.D. in philosophy from the University of North Carolina, that he was a Lieutenant in the Navy and that he was very wealthy. The defendant discussed marriage with her and told her that since he had a $75,000 insurance policy on himself (which was false) he wished to take out $50,000 insurance on her life. Harold Campbell, an agent of Aetna Life Insurance Company, took the application in June 1964, but the policy was not issued because Miss Ketcham turned out to be uninsurable. The defendant himself paid the initial premium but it was later refunded. Thereafter the romance became less serious.

In the summer of 1964 the defendant met Miss Janice Hill, then seventeen years of age. He told her that he had gone to the University of North Carolina and was about to receive

his Doctors Degree. A love affair developed between the defendant and Miss Hill. They continued to see each other after November against the wishes of Miss Hill's parents. The defendant dated Miss Hill as late as March 1965, after he was engaged to Brenda Minton. The defendant discussed marriage with Miss Hill, and without her consent or knowledge pursued a $50,000 double indemnity life insurance policy on her life with Joseph Sharpe, a John Hancock Insurance Company agent. A proposal of insurance was prepared but the defendant postponed the entire matter, telling the insurance agent that he had wrecked his car.

This evidence as relates to Miss Ketcham and Miss Hill was relevant and was properly admitted because it tended to prove circumstantially his overall plan.

Objection was also interposed to evidence relative to the defendant's association with Miss Mary Jane Kuntz and Miss Cathy Hildebrand.

In November and thereafter the defendant was seeing Miss Kuntz. She testified that she slept with the defendant in Washington, D. C. during the last part of December, in a room where the defendant's fiancee was sleeping with John Derboghossion. This was about two weeks after the insurance policy was issued on Brenda Minton and while the defendant and Miss Minton were planning marriage. Miss Kuntz became pregnant by the defendant and gave birth to his child on September 30, 1965. The child was given up for adoption.

After the defendant was married to Brenda Minton he went to North Carolina and met Cathy Hildebrand, a twenty-year-old college student. He dated her May 20, 21, 22 and 23, 1965. On June 10, 11, 12 and 13 he slept with her at a motel in Greenville, North Carolina. This was only one week before the drowning. At this time he discussed with her marriage and life insurance. On June 18, 1965, which was one day before the drowning, the defendant telephoned Cathy Hildebrand and told her he would see her after he picked up a package in Chicago containing $100,000.

The State not only had the right to prove the overall plan to insure, to marry and to murder a young girl, but was permitted to introduce evidence tending to show a lack of affection on the part of the accused for his fiancee and wife. See 40 C. J. S. Homicide § 229 (1944). Certainly evidence that in the last part of December 1964 the defendant was holding in abeyance a proposal of insurance on Miss Hill while he had Miss Minton already insured and was engaged to her, and was sleeping with Miss Kuntz while his fiancee was sleeping in bed with another man in the same room, was relevant on the issue of affection or want of it, which goes to the issue of motive. We find no error in admitting this evidence relative to Miss Kuntz and Miss Hildebrand.

At the time the insurance policy was procured on Miss Minton's life she was pregnant by E. J. McGuire, who was a friend of the defendant. McGuire and the defendant were both assigned to the Sam Rayburn submarine and shared a house in Virginia. Miss Minton had a miscarriage at a hospital in Washington during the first week of January 1965. The defendant went to McGuire and told him that Miss Minton was demanding $10,000 from him (McGuire) to take care of herself and the child. As a result of that contact and negotiation about January 16, 1965, McGuire gave the defendant a promissory note for $10,200 and paid $200 on it before the defendant magnanimously cancelled the debt. He told McGuire that he was going to marry Miss Minton in order to give the child a name. In actuality, there was no child because the miscarriage had already occurred.

This evidence relating to the transaction with McGuire was objected to. The State argues that the evidence tends to prove circumstantially the overall plan to kill and to collect insurance. Some of the details incident to the transaction (which we omit here) may tend to serve that purpose. However, we do not deem it necessary to rule on the exceptions which raise this point because counsel

for the defense cross-examined on this matter without reserving their objections. This court has held that under such circumstance objection is waived.

"We need not consider whether the evidence given by the witness Barber, or the exhibit offered in evidence, should have been excluded because appellants' counsel cross examined this witness concerning his testimony and the exhibit without reservation of their objection. The objection was thereby lost and if any error had been committed in the admission of the testimony or the exhibit, it was cured. *State v. Cavers,* 236 S. C. 305, 114 S. E. (2d) 401." *State v. Puckett,* 237 S. C. 369, 380, 117 S. E. (2d) 369 (1960).

The defendant married Brenda Minton on April 1, 1965. They moved into the home of Brenda's parents. However, during the next thirty to sixty days the defendant was gone from home several days at a time on more that one occasion. He represented that he had to leave on an assignment with the CIA, but it is inferable from the testimony that he visited Mary Jane Kuntz on one of these occasions and visited Cathy Hildebrand in North Carolina on at least two occasions.

During the last of May or early part of June they moved to a cottage at Folly Beach. Soon thereafter James Stone, a twenty-two-year-old shipmate of the defendant visited in their home and had dinner with them. The defendant told Stone that he was dissatisfied with Brenda and that she was a "fink." The State sought to show that it was at first defendant's plan to have his wife murdered by Stone, who was apparently a rather gullible character. He attempted to interest Stone in the operation of a heroin ring. In order to impress Stone he told him that he was a member of the Mafia and that they could make a lot of money together smuggling heroin into the United States. He told Stone that before he could be trusted he would have to pull a "wipe job", by which he meant a murder. Scuba diving equipment was discussed in connection with it. Soon thereafter Stone had to go to sea and did not return until some time after the drowning.

The trial judge properly admitted this evidence on the issue of the overall plan.

The defendant argues that the court erred in allowing The State to introduce evidence of many false statements made by the defendant such as assertions that he was a wealthy person, that he had large insurance policies on himself, was the beneficiary of trust funds, was a Lieutenant in the Navy, was a CIA man, was working on his Doctors Degree and was a Ph.D. It is common knowledge that normally an insurance company would not issue a $50,-000 double indemnity policy on a seaman's fiancee. In order to procure the insurance it was necessary for him to build himself up as one with a good background and represent himself as being one capable of paying for such policy. In addition, the defendant needed to impress not only the insurance agent but the girls themselves to whom he talked about insurance. Had he told them the truth it is certain no insurance company would have issued the policy, and if he had told the girls the truth none would likely have cooperated by making an application. Accordingly, this evidence was a relevant part of the overall plan to become engaged, to insure, to marry and to murder, and the trial judge properly so held.

A considerable amount of testimony was permitted with reference to communications between James Stone, Cathy Hildebrand and the defendant after June 19, 1965, while defendant was in jail awaiting trial. These communications evidenced a scheme to procure false witnesses to the events on the beach on the morning of June 19. In order to convince his confederates that plenty of money for witnesses was available, the defendant represented that he was the recipent of a large sum of money obtained from the "great train robbery" in Britain in 1962. He told Cathy Hildebrand to go to Switzerland to get the money. An exception was filed charging error on part of the lower court in admitting evidence of efforts by the defendant to employ false witnesses to testify. It was incident to such testimony that mention was made by the defendant of the "great train rob-

bery." This exception is not argued in appellant's brief and accordingly, the same is abandoned. There was no error in admitting the testimony.

The argument of counsel for the defense that The State produced evidence that the defendant was guilty of nonsupport of his child is not supported by the record. The child was born on September 30, 1965, and was put up for adoption immediately. At that time the defendant had been in jail for more than one hundred days.

As shown by *Lyle, supra,* there are several exceptions to the rule that ordinarily evidence of the commission of another crime is not admissible. Some of the evidence objected to by counsel for the defense and admitted by the judge was properly permitted under more than one exception, as for example, motive and intent. We consider most of it relevant on the question of a design or plan.

It cannot be gainsaid that the existence of a design or plan to act in a certain way has probative value to show how one in fact did act. Although plans are not always carried out, one who plans to act in a certain way is more likely to act in that way because of the existence of the plan.

The plan or design which The State sought to show in the present case was reasonably specific in its application to a particular course of conduct, and it was sought to be shown as a plan of long standing existence and as being backed by a long existing, fixed intention to act in accordance with the plan. Unquestionably the existence of such plan or design would be highly relevant on the question of whether the defendant in fact acted in accordance with the plan.

Such a design or plan like any other fact at issue can only be shown by specific items of evidence, and the relevancy of these must be determined with reference to the design. The question is whether the particular item of evidence tends to show the existence, the nature, or the content of the plan.

Much of the showing is evidence of the conduct of the defendant, and the specific question becomes whether the particular conduct circumstantially tends to prove the design or plan.

In the attempt by The State to show the detailed and long-considered plan of the defendant, many hundreds of potential relevancy issues passed before the trial judge. It is neither desirable nor possible for this court to lay down any general rule that will serve as a solution for every issue, for it is a different question of experience and common sense in each instance. Nor is it profitable for this court to review seriatim in this opinion all of the decisions by the trial judge on the items of evidence objected to by the defendant. The precedents in the area of relevancy are of very limited value, and the trial judge must have wide discretion on the innumerable questions of relevancy before him. His decisions should be reversed only for abuse of that discretion.

We hold that the existence of the design or plan which the State sought to show was relevant and admissible. We further hold that the trial judge committed no abuse of discretion in admitting the evidence which purported to disclose the overall nature and content of the plan to insure, to marry, to murder and collect insurance. And this is true despite the fact that the evidence of prior actions, criminal and otherwise, simultaneously and inescapably reflected on the defendant's character.

Appellant next alleges error in that the trial judge, over objection, submitted the issue of voluntary manslaughter to the jury. No objection was raised in the court below nor here because involuntary manslaughter was also submitted to the jury. Appellant argues that there was no evidence from which the jury could reasonably infer that he took his wife's life in sudden heat and passion and upon sufficient legal provocation.

Assuming, without so deciding, that the appellant's contention that the evidence did not support a possible finding of guilty of manslaughter is sound, we fail to see how the

appellant could have been prejudiced by the manslaughter charge. No cases have been cited to us, nor have we found any, which hold that prejudice results from such a charge.

"Effect of erroneous instructions—as to lower grade or degree, where defendant convicted of higher. Generally speaking, an accused cannot successfully complain of error in instructions which are favorable to himself. Consequently, one who has been convicted of a superior grade or degree of culpable homicide is not to be deemed prejudiced by, and cannot attack, an erroneous charge in respect of a lower grade or degree of homicide." 40 Am. Jur. (2d) Homicide § 527 (1968).

The trial judge charged the jury as follows:

"If you find him guilty and there is a reasonable doubt as to whether or not he is guilty of murder or voluntary manslaughter or involuntary manslaughter, you should give him the benefit of that doubt and find him guilty of the lesser offense. But, of course, you gentlemen may not and could not convict the defendant of either murder or voluntary manslaughter or involuntary manslaughter unless his guilt has been established beyond a reasonable doubt."

The fact that the jury found the defendant guilty of murder is persuasive that the manslaughter charge was in his favor. The jury found him culpable of an offense greater than manslaughter. The manslaughter charge afforded him at least a potential avenue for escaping a murder conviction.

We have given consideration to the entire charge and to the able brief of appellant but are not persuaded that the jury was confused by the charge now alleged to have been unwarranted. The charge if improper was not prejudicial.

Question IV as stated in the defendant's brief is as follows: "Did the court adopt such a standard of admissibility as to deprive the appellant of his fundamental guarantee of a fair trial as contemplated by the Constitution of the State of South Carolina and the United States Constitution?"

The exceptions under this question direct attention to the cumulative effect of allegedly irrelevant and prejudicial evidence with which we dealt in questions one and two. Inasmuch as we found no error in the admission of this evidence by the lower court, we find no merit in the contentions in the question quoted above.

On this appeal the defendant has sought to raise several questions which were admittedly not raised in the court below. He challenges certain remarks of the solicitor in closing argument as being improper and prejudicial; he challenges the charge of the trial court with respect to the duty of the jury to reach a verdict if possible; he alleges that the verdict was coerced by confinement of the jury in violation of Section 38-303 of the South Carolina Code and he alleges that testimony of one witness for the State (which will be discussed below) was tantamount to testimony of the results of a lie detector test. None of these objections was brought to the attention of the trial judge, and the defendant's attempt to raise them on this appeal for the first time is based on a doctrine often applied by this court.

"It is not an open question any longer that in a capital case this court will take notice of any error apparent on the record affecting the substantial rights of the accused even though not made a ground of appeal." *State v. Bigham,* 133 S. C. 491, 131 S. E. 603, 609 (1926).

We hold, however, that the policy of reviewing questions not preserved during the trial does not extend to cases in which the defendant has received a sentence less than death. This is an appellate court of review and a trial judge should not be reversed on an issue upon which he had no opportunity to rule. The fact that the defendant could have been sentenced to death does not mean that he is entitled to the benefits of the doctrine of *in favorem vitae* which we have applied where the death penalty is imposed.

"The rule is well established that if asserted errors are not presented to the lower Court, the question cannot be

raised for the first time on appeal. *State v. Alexander,* 230 S. C. 195, 95 S. E. (2d) 160, and *State v. Bolin,* 230 S. C. 204, 95 S. E. (2d) 163." *State v. McCrary,* 242 S. C. 506, 509, 131 S. E. (2d) 687, 688 (1963).

Though not required to meet the issue, it is not inappropriate to state that we find no error on the part of the trial judge in handling the matters which give rise to the questions upon which we omit detailed consideration.

Finally, the defendant raises an additional question concerning interrogation of Sergeant West of the Charleston County Police by the solicitor including the mention of a lie detector test:

[By solicitor]

"Q. All right, sir, go back on the witness stand. Sergeant, after you left the Ohlandt scene, where, if any place, did you go, and what, if anything, did you do?

"A. I brought him to the Charleston County Police Headquarters, at which time I continued to question him. I asked him if he was willing to be examined by a polygraph [sic] machine, and he told me he was. I made arrangements through Mr. Ledford, who was the Truth Associates here in Charleston, to bring his equipment to the office at the Charleston County Police Headquarters and examine the defendant."

"MR. MORRISON: [defense counsel] Excuse me, may I ask you to clarify something at this time? I believe Sergeant West's earlier testimony was that you talked with defense counsel and he agreed for you to go to Folly Beach with the accused. Was that right? I just wonder, is this part of what you thought we had agreed to?

"A. I made no mention that you had agreed that he be examined on a polygraph, too.

"MR. MORRISON: All right, I just wanted to check that.

[By solicitor]

"Q. Sergeant, without relating anything more about that, did you do anything afterwards with the Defendant?

"A. Yes, sir, I did.

"Q. All right, what was that?

"A. On July the 30th, 1965 I obtained through Magistrate McCarthy an arrest warrant for the Defendant, charging him with murder.

"Q. Did you execute the warrant?

"A. I requested Chief Bunch of the Folly Beach Police Department to execute the warrant."

The defendant argues that this exchange not only constituted an improper comment upon the fact that a lie detector test had been given, but that it also imported an unmistakable inference that the defendant had failed the test. We need not decide this matter, however, because the defendant not only failed, as explained above, to object to the testimony of Sergeant West concerning the lie detector test, but also cross examined the witness on this matter, emphasizing the fact that he volunteered to take it, without reserving or stating any objection.

The defendant did object at trial, however, to the refusal of the lower court to order Sergeant West to allow defense counsel to question the polygraph examiner engaged by him. The defendant argues that (1) when Sergeant West revealed that he had followed up a polygraph test by charging the defendant with murder, the inference was necessarily imported that the defendant had taken and failed a lie detector test; (2) the polygraph examiner thereby became a witness against the defendant; (3) the defendant therefore had an absolute right to confront the witness; and (4) the refusal of Sergeant West to permit the examiner to talk to defense counsel constituted concealment of evidence by the State.

The lower court's refusal to require Sergeant West to permit the examiner to discuss the test with defense counsel was expressly based on the fact that in no event could the examiner be permitted to testify concerning the results of the test and that the motion by defense counsel, during the middle of the trial, came too late.

We find no error in the ruling of the court below with respect to this matter. Assuming the accuracy of the defendant's contention that the results of a lie detector test are inadmissible in a criminal proceeding, we must assume that the defendant's argument concerning evidence which he hoped to gain from the polygraph examiner refers to something other than the results of the polygraph. If the defendant wished the opportunity to seek such evidence, we find no error in the trial court's ruling that the motion, coming in the middle of the trial, was too late. Moreover, we fail to perceive any way whatever for the defendant to have been prejudiced by the court's refusal of this motion. Out of the presence of the jury, but in the presence of both the defendant and his counsel, the solicitor explained to the court that in fact no polygraph results exist because the defendant refused to cooperate in the administration of the test. Neither the defendant nor his counsel attempted to deny or explain the solicitor's statement either at the time it was made to the court or at any other time so far as the record discloses.

The exceptions are overruled and the lower court is

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.