## 21442

The STATE, Respondent, v. Ronald Raymond WOOMER, Appellant.

(277 S. E. (2d) 696)

*Chief Atty. John L. Sweeny* and *David I. Bruck,* both of *S. C. Commission of Appellate Defense,* Columbia, *for appellant.*

*Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen. Kay G. Crowe,* Columbia, and *Sol. James O. Dunn,* Conway, *for respondent.*

April 28, 1981.

LITTLEJOHN, Justice:

Defendant Ronald Raymond Woomer was indicted in Horry County and convicted by a jury (1) of the murder of Della Louise Sellers, (2) of assault and battery with intent to kill on the person of Wanda Summers, (3) of criminal sexual conduct in the first degree on the person of Wanda Summers, and (4) of two counts of kidnapping of Wanda Summers and Della Louise Sellers. He was sentenced to punishment by death. An automatic review by this court is mandated by § 16-3-25, *Code of Laws of South Carolina* (1976), as amended (Supp. 1980). An understanding of the facts is necessary to treatment of the issues.

On February 20, 1979, Woomer and Gene Skaar left West Virginia, their apparent home, and drove to Myrtle Beach in Horry County, South Carolina. They arrived the following day, rented a motel room, and immediately visited a local coin shop owner. The owner and Skaar agreed upon a scheme whereby the owner would identify local coin collectors and point out their residences. Skaar and Woomer would then steal the coin collections and sell them to the coin shop owner. Although Woomer apparently had never before participated

in this scheme, he had been expressly told by Skaar, prior to departing from West Virginia, that the purpose of the trip was to make money by robbing people. Woomer additionally understood beforehand that no victims were to remain alive.

On February 22, Woomer and Skaar drove about 130 miles to the home of John Turner in Colleton County, where they stole his coin collection and numerous suits. Woomer then marched Turner to a back room and killed him with a single pistol shot in the head.

They began their return to the motel where they could contact their informer, sell the coins, and realize their profit. However, they first stopped at another home and robbed the residents of some money and several firearms. The occupants, a man, woman and young child, were all shot in the head and killed by several blasts from Woomer's shotgun.

Driving back towards Myrtle Beach around 6:30 p. m., they stopped at Jack's Mini-Mall, a small grocery store/filling station on Pawley's Island in Georgetown County, and decided to rob it. Della Louise Sellers and her husband had relieved Wanda Summers about 3 o'clock that afternoon and were managing the store when Woomer and Skaar entered. Mrs. Summers later returned to the store, together with several customers. Everyone was forced to the floor. Woomer and Skaar required Mrs. Sellers and Mrs. Summers to assist them in opening the cash register. Both women were then taken hostage.

Upon reentering Horry County, the hostages were requested to find some back road where they were to be released unharmed. They were raped instead. Woomer then ordered them to leave by walking away close together. He trailed them about twenty-five yards and then fired his shotgun, striking Mrs. Summers in the lower side of her head and knocking both women to the ground. When Mrs. Sellers turned and began screaming, Woomer placed his handgun to her forehead and shot her.

Woomer and Skaar returned to the motel. Mrs. Summers, despite missing the lower quarter of her face, remained conscious and stumbled to a nearby house. An ambulance rushed both victims to the hospital. Mrs. Sellers died several hours later; Mrs. Summers survived and testified at the trial.

Police officers arrived at the motel the same evening to arrest Woomer and Skaar. Skaar apparently shot and killed himself during the arrest. Woomer was taken into custody and gave a lengthy confession the following day.

Numerous exceptions have been raised on appeal by Woomer.

I. *Fees Limitation for Expert Services.*

Woomer argues that the statutory limitation on expenditures for skilled services for an indigent defendant violated his Fourteenth Amendment rights to due process and equal protection.

Code § 16-3-26(c) *as amended* (Supp. 1980) of the death penalty statute provides in part the following:

"(C) Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obain such services on behalf of the defendant and shall order the payment, from state funds appropriated for the defense of indigents, of fees and expenses not to exceed two thousand dollars as the court shall deem appropriate . . ."

It is contended by Woomer that this imitation denied him a complete psychological evaluation, thereby hindering preparation of an adequate defense. We disagree.

The trial judge denied Woomer's request to exceed the limit only after finding that a need for excess funds had not been shown. We agree with his findings. The record discloses that Woomer received three (3) psychiatric examinations

covering a spectrum of the most advanced testing known. Each expert testified that Woomer knew right from wrong on February 22, 1979. His own psychiatrist, financed by state funds, testified as follows:

"It's my opinion that both legally and morally, this patient knows the difference between right and wrong. It's simply that he doesn't care . . . He does what he wants to do, when he wants to do it; and if it's an illegal act and there are witnesses, then he simply kills them."

The ability to adequately prepare one's defense may well entail access to certain necessary expert services; it does not require the State to blindly fund an expensive fishing expedition. There simply is no showing that failure to relax the statutory limitation denied Woomer a far trial.

II. *Admissibility of Evidence of Rape of Mrs. Sellers.*

Under the South Carolina statutory complex, a capital defendant's guilt or innocence is determined by a judge or jury in the first stage of a bifurcated trial. During the first phase of this trial, the pathologist who examined the body of Mrs. Sellers following the rape and shooting was called by the State to testify concerning his examination. He testified, without objection, that the cause of Mrs. Sellers' death was a gunshot wound to the brain inflicted by a .32 calibre pistol placed directly in contact with the scalp. The pathologist then identified a distorted projectile as being the bullet he recovered from the brain of the deceased. Further testimony described significant bruising around the face of Mrs. Sellers, including badly swollen and bloody eyes. Counsel for Woomer then made an out-of-court objection to the introduction of any testimony connected with the rape of Mrs. Sellers on the grounds that it was immaterial and would be highly inflammatory and prejudicial since she was raped by Skaar and not Woomer. The State argued that any such testimony was admissible to show the circumstances surrounding the kidnapping in which Woomer participated

and under the theory that "the hand of one is the hand of all." The objection was overruled and the pathologist proceeded to testify to human bite marks, in addition to other bruises and abrasions, found upon Mrs. Sellers' body.

Evidence is admissible if it logically or reasonably tends to prove or disprove a crime charged or any fact material to the issue. *State v. Hoffman,* 257 S. C. 461, 186 S. E. (2d) 421 (1972). The decision of the trial judge to receive or exclude the challenged evidence is largely one within his discretion and will not be disturbed absent some clear abuse. *State v. Hiott,* S. C. 268 S. E. (2d) 163 (Op. No. 21398, Smith's Advance Sheets, filed March 3, 1981).

It is well-established that one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose. 21 Am. Jur. (2d) *Criminal Law* § 132, 22A C.J.S. *Criminal Law* §§ 754, 774. To admit evidence under this theory, the existence of the common design and the participation of the accused against whom the evidence is offered should first be shown. 22A C.J.S. *Criminal Law* §§ 755, 756.

Under the above principles of law, we hold that the testimony of the pathologist concerning the condition of Mrs. Sellers' body was properly admitted. There was ample testimony at that stage of the trial from which the trial judge could find that Woomer and Skaar were partners in furtherance of illegal purposes. Several eye-witnesses present at Jack's Mini-Mall during the robbery identified Woomer in court as one of the participants. Mrs. Sellers and Mrs. Summers undisputably were carried away from the store against their will by the concerted force of Woomer and Skaar. Other evidence then before the court strongly indicated that both women were raped before being shot. Under these circumstances, we are satisfied that Woomer and Skaar

had joined hands in undertaking the robbery of Jack's and the subsequent kidnapping, raping, and shooting of Mrs. Summers and Mrs. Sellers. Therefore, any acts of Skaar committed incidental to this series of events were admissible against Woomer.

III. *Admissibility of Evidence of Prior Crimes.*

During the guilt phase of the trial, the State sought to introduce certain evidence of the other killings committed by Woomer just prior to the episode at Jack's Mini-Mall. The State argued at trial that this evidence tended to identify and place Woomer at Jack's Mini-Mall and to show a common design or scheme on Woomer's part to dispose of all victims. It was admitted into evidence over the objections of defense counsel that it was irrelevant and highly prejudicial and not admissible under *State v. Lyle,* 125 S. C. 406, 118 S. E. 803 (1923).

In *Lyle,* this court held that evidence of other crimes is competent to prove the specific crime charged when it tends to establish, among other things, (1) a common plan or scheme involving two or more crimes, or (2) the identity of the accused presently on trial.

More recently, we said:

"It cannot be gainsaid that the existence of a design or plan to act in a certain way has probative value to show how one in fact did act. Although plans are not always carried out, one who plans to act in a certain way is more likely to act in that way because of the existence of the plan.

The question is whether the particular item of evidence tends to show the existence, the nature, or the content of the plan. Much of the showing is evidence of the conduct of the defendant, and the specific question becomes whether the particular conduct circumstantially tends to prove the design or plan." *State v. Anderson,* 253 S. C. 168, 169 S. E. (2d) 706, *cert. den.,* 396 U. S. 948, 90 S. Ct. 386, 24 L. Ed. (2d) 253 (1969).

The plan or design which the State sought to show was that Woomer and Skaar left West Virginia iintending to come to South Carolina, make money by robbery, and dispose of all victims. A photograph and driver's license of one of the robbery victims were found in the motel room of Skaar and Woomer. Their admission into evidence, along with testimony that this victim had been shot and killed, was proper since it was used to show the existence and commisson of a preconceived plan and tended strongly to implicate Woomer as a participant. The scheme and Woomer's participation in it were later confirmed at trial by the taped confession of Woomer himself. In that confession, Woomer explained his involvement with Skaar, their scheme to rob and dispose of witnesses, and the actual execution of that scheme, including the robbery and killing of the victim from whom the photograph and driver's license were taken. Even without the confession, however, the evidence would have been proper under *State v. Anderson, supra.* No error was committed.

## IV. *Closing Argument of State and Charge to Jury.*

The punishment of an accused person who is found guilty of murder is determined in a separate sentencing procedure (the second stage of the bifurcated trial). The sentencing proceeding is normally conducted by the same trial judge and before the same jury as the first phase. During this second phase the parties may introduce additional admissible evidence in extenuation, mitigation, or aggravation of punishment. After the introduction of any such evidence, both the State and the defense are entitled to make a closing argument in favor of or against imposition of the death penalty. Following arguments, the judge must charge the jury to consider any mitigating circumstances otherwise authorized or allowed by law and any of the statutory aggravating and mitigating circumstances that are supported by the evidence. If the jury finds at least one aggravating circumstance beyond a reasonable doubt, it may recommend the death penalty. The recommendation must be unanimous, and the jury must des-

ignate in writing the aggravating circumstance(s). The jury may recommend a sentence of life imprisonment even if it finds a statutory aggravating circumstance. Where a recommendation of death is made, the trial judge must impose the death penalty if he affirmatively finds that it is warranted under the attending evidence and that it is not a result of prejudice, passion, or other arbitrary factor.

We have interpreted this State's Death Penalty Statute to require the trial judge instruct the jury that it could effectively impose life imprisonment instead of death even if it found one or more statutory aggravating circumstance(s). Failure to so charge may require a death penalty sentence to be vacated. *State v. Tyner*, 273 S. C. 646, 258 S. E. (2d) 559 (1979); *State v. Goolsby*, S. C., 268 S. E. (2d) 31 (1980).

The required charge was not given. The State argues, however, that the jury had been thoroughly indoctrinated with the applicable law by way of counsel's questioning on *voir dire* and closing arguments. This position cannot be sustained.

No principle of law is more firmly established than the solemn duty of the court to determine the law of the case and declare it to the jury. That jury is bound by, and must accept and be governed by, the instructions of the court. 75 Am. Jur. (2d) *Trial* § 574. Even assuming, arguendo, that the statements of law by counsel during the course of a trial were legally correct, the adversarial nature of our trial system mandates that the jury have a complete statement of the law from the trial judge. Arguments of counsel simply cannot substitute for instructions by the court. *Taylor v. Kentucky*, 436 U. S. 478, 98 S. Ct. 1930, 56 L. Ed. (2d) 468 (1978).

This court has also found reversible error where counsel argues to the jury that its decision for life or death is not necessarily binding and is subject to higher review. *State v. Gilbert*, 273 S. C. 690, 258 S. E. (2d) 890 (1979).

The following appears in the record:

[Closing argument of the State]

"What then? Does it end there? No, it doesn't and we've explained this to you. Mr. Dunn has explained it to you. What happens then? His Honor, before he can impose the death penalty based on your recommendation, he must make some affirmative findings, and—

[Defense attorney]: Your Honor, we have a matter, please.

[W]e are objecting at this point to any reference made in the record that the jury recommends the death sentence, the imposition of the death sentence, and that it's then up to Your Honor to impose. We feel like this takes the burden off of the jury in their minds; . . .

[Counsel for the State]: May I, Your Honor, say that Your Honor must make some affirmative findings, and then if you make those findings that you must, upon their recommendation, make—

The Court: It's mandatory that I impose the death penalty.

The Court: Well, again, I think the jury should assume that upon imposition of the death sentence, that it will be in fact imposed. I just don't think it would be proper for you to leave anything in the minds of the jury that even though they might recommend it, there's a chance that his life might be spared. That inference should be left with the jury.

[Closing argument of the State later continued]:

Now, what is His Honor's role? Ladies and gentlemen, I think you should clearly understand that if you make a recommendation for the death penalty that you should expect that that should be carried out. I'm not trying to spread your responsibility thin. I say to you I made the decision to seek it. As solicitor, that's my function. Your function as a juror is to recommend, and His Honor's function is to impose it.

But, he can only do that—he cannot, he shall not, he must not, and I submit, will not follow your recommendation for a death penalty in this case until he has found, he having heard the same evidence from this witness stand, that the State —that your recommendation is supported by substantiated by the evidence, that it is warranted by the evidence. And he must, as his duty as the trial judge in this case, make that finding affirmatively on the record.

Next, he must find that it was not done arbitrarily. Next, that it was not done with prejudice, not done capriciously, with prejudice, or any other arbitrary factor, but that it was warranted under the evidence."

Despite the ruling of the trial judge, it is apparent that the prosecutor later returned to his attempt to minimize the solemn responsibility of the jurors. In *Gilbert,* where the State's closing argument was in a similar vein, this court said:

"These comments by the solicitor suggested to the jury that its responsibility for deciding appellants' fate was lessened. Under our judicial system, the jury is given the heavy responsibility of determining whether a convicted murderer will live or die. It was erroneous and extremely prejudicial for the solicitor to imply to the jury that its burden could be passed on to a higher court."

Whether the reference be to further review before the immediate trial judge or to a higher court, the effect on the jury is the same: its responsibility is lessened through the inferences that ultimate outcome is determined by the court.

The imposition of the death penalty must be set aside because of the insufficient jury charge and the improper closing argument of the State.

We have treated those issues argued by counsel for Woomer. Several exceptions are enumerated in the transcript but not pursued in counsel's brief. Under our rules, such are

deemed abandoned. However, inasmuch as this is a capital punishment case, all of them have been considered and found without merit. In addition, we have examined the entire record and find no error prejudical to Woomer. Such examination of the record has been made in addition to those issues argued and/or enumerated in the exceptions.

We affirm the conviction, but vacate the death penalty and remand for resentencing pursuant to § 16-3-25(E) (1) and (2) *Code of Laws of South Carolina* (1976), *as amended* (Supp. 1980).

Affirmed in part;

Reversed in part and

Remanded.

LEWIS, C. J., and GREGORY, J., and WILLIAM L. RHODES, JR., Acting Associate Justice, concur.

NESS, J., dissents.

HARWELL, J., not participating.

NESS, Justice (dissenting):

I respectfully dissent, concluding the majority erred in vacating the death sentence imposed on Ronald R. Woomer.

I believe the solicitor's closing argument in this case distinguishable from the ones in *State v. Tyner,* 273 S. C. 646, 258 S. E. (2d) 559 (1979); and *State v. Gilbert,* 273 S. C. 690, 258 S. E. (2d) 890 (1979). In *Tyner* and *Gilbert* the closing arguments attempted to lessen the jury's burden of recommending/imposing the death sentence by informing them of appellate review of all death sentences. Here, the solicitor told the jury he was not trying to lessen their burden, but, was merely emphasizing the importance of their task and that they are required to return a verdict based solely upon the evidence presented from the witness stand. He further emphasized the trial judge would review the evidence to

ensure the verdict was proper. I believe the argument was a proper attempt to inform the jury of the importance of their role and not an attempt to lessen their responsibility.

The majority also held the trial judge failed to charge the jury that they could return a life sentence even if they found statutory aggravating circumstances. I disagree. Examining the jury charge in its entirety I find the trial judge properly instructed the jury as to possible sentences they could return. *State v. Tucker,* 273 S. C. 736, 259 S. E. (2d) 414 (1979).

I have carefully reviewed the entire record for prejudicial errors overlooked by counsel and find none. I would affirm the conviction and sentence of death of appellant, Ronald R. Woomer.

Affirmed.