Ronald Raymond WOOMER,
Petitioner–Appellant,

v.

James AIKEN, Warden; T. Travis Medlock, Attorney General of South Carolina, Respondents–Appellees.

No. 88–4001.

United States Court of Appeals,
Fourth Circuit.

Argued July 11, 1988.

Decided Sept. 14, 1988.
Rehearing and Rehearing In Banc
Denied Oct. 21, 1988.

W. Gaston Fairey (Fairey & Parise, P.A., Columbia, S.C., on brief), for petitioner-appellant.

Donald John Zelenka, Chief Deputy Atty. Gen. (T. Travis Medlock, Atty. Gen., Columbia, S.C., on brief), for respondents-appellees.

Before CHAPMAN, WILKINSON, and WILKINS, Circuit Judges.

WILKINS, Circuit Judge:

Ronald Raymond Woomer, a South Carolina inmate, appeals from the denial of his petition for a writ of habeas corpus, 28 U.S.C.A. § 2254 (West 1977), challenging his death sentence under the fifth and sixth amendments. We affirm.

I.

Woomer was sentenced to death for one of several murders he committed in February 1979. Woomer and Gene Skaar traveled from West Virginia to South Carolina on February 20 for the express purpose of committing robbery and murder. On February 22 they drove to the Colleton County home of John Turner where they stole a coin collection and clothing. Woomer killed Turner with a pistol shot to the head. A few hours later they committed another robbery at a home in Georgetown County during which Woomer killed a man, woman, and young child with several shotgun blasts to their heads. Later that same day they robbed a small grocery store and kidnapped two women, Mrs. Della Sellers and Mrs. Wanda Summers. They drove to a dirt road in Horry County where both women were raped. Woomer then marched the women down the road and fired his shotgun at them. The blast destroyed the lower half of Mrs. Summers' jaw, and although Woomer believed that she was dead, she survived to testify at trial. Realizing that Mrs. Sellers was only slightly wounded by the shotgun blast, Woomer fired a fatal pistol shot to her head.

Woomer was convicted of the murder of Mrs. Sellers, assault and battery with intent to kill Mrs. Summers, criminal sexual conduct in the first degree of Mrs. Summers, and kidnapping of both women.[1] After receiving testimony during a separate sentencing proceeding,[2] the jury found the

1. Skaar later committed suicide when the motel in which he and Woomer were staying was surrounded by law enforcement personnel. Woomer received life sentences for the murders committed in Colleton and Georgetown Counties.

2. The South Carolina death penalty statute provides that: "Upon conviction or adjudication of guilt of a defendant of murder, the court shall conduct a separate sentencing proceeding to de-

termine whether the defendant should be sentenced to death or life imprisonment. .... In the sentencing proceeding, the jury or judge shall hear additional evidence in extenuation, mitigation or aggravation of the punishment." S.C.Code Ann. § 16–3–20(B) (Law.Co-op.1976). Woomer elected to testify during this first proceeding, but declined to do so during the sentencing proceeding on remand.

existence of two statutory aggravating circumstances—rape and kidnapping—and recommended that Woomer be sentenced to death. S.C.Code Ann. §§ 16–3–20 (C)(a)(1)(a) and (1)(c) (Law. Co-op.1976). On appeal, the South Carolina Supreme Court affirmed the convictions, but vacated the death sentence and remanded for resentencing due to insufficient jury charges and improper closing argument from the state prosecutor during the sentencing proceeding. *State v. Woomer*, 276 S.C. 258, 277 S.E.2d 696 (1981). On remand, another jury again found that the murder of Mrs. Sellers was accompanied by the statutory aggravating circumstances of kidnapping and rape and recommended the death sentence. This sentence was affirmed on appeal. *State v. Woomer*, 278 S.C. 468, 299 S.E.2d 317 (1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1413 (1983).

After exhausting his state post-conviction remedies, Woomer filed this petition for a writ of habeas corpus in federal court. Although he raised numerous issues below, he only pursues three in this appeal, two of which relate to the State's presentation of psychiatric testimony at the second sentencing proceeding concerning his future dangerousness. He alleged that admission of this evidence violated his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel. He also contended that he was denied effective assistance of counsel because his appointed attorneys failed to investigate and present in mitigation available psychiatric and expert testimony concerning his drug use.

The district court denied the petition, finding that admission of the psychiatric testimony did not violate Woomer's fifth amendment privilege. And, although it found that admission of the testimony violated Woomer's sixth amendment right to counsel, the district court determined that

the violation was harmless.[3] The district court also found that Woomer was not denied effective assistance of counsel. We affirm the denial of the petition by the district court based on its correct findings that admission of the psychiatric evidence did not violate Woomer's fifth amendment privilege and that he received effective assistance of counsel. We need not analyze the district court's reasoning regarding harmless error for the admission of the psychiatric testimony did not violate Woomer's sixth amendment right to counsel.

## II.

Shortly after Woomer's arrest in February 1979, defense counsel moved for, and the State consented to, Woomer's commitment to a state psychiatric hospital for determination of his competency to stand trial. In March, on motion of the State and with the express consent of his defense counsel, he was recommitted for an examination to determine his sanity at the time of the alleged crimes. Woomer was found both competent to stand trial and not mentally ill.

During these commitments Woomer was interviewed by a social worker, a psychologist, and Dr. Mario Galvarino, a forensic psychiatrist. Dr. Galvarino testified for the State in its case-in-chief at the second sentencing proceeding that Woomer was given paraphrased *Miranda*[4] warnings during both commitments. Specifically, Dr. Galvarino testified that he advised Woomer that:

> You can tell me as much as you want, or as little as you want, but you have to realize that whatever you tell me can be held against you, since we do not have any privacy, and I will have to forward a report to the Court.
> I told him that he could tell me as much or as little as he wanted, about the offense, or the case, but whatever he told me could be used against him since I did

---

**3.** Although the sixth amendment issue was not specifically raised in Woomer's petition, the district court considered it on the merits.

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Both the social

worker and psychologist testified that they also individually advised Woomer of his constitutional rights prior to conducting an examination.

not have any privacy, furthermore, a copy of my statement will be sent to court.

Dr. Galvarino further testified that Woomer clearly understood these warnings and voluntarily cooperated during the examinations. In fact, Woomer demonstrated his understanding by invoking his right to remain silent at one point during the sanity evaluation, stating that he had been informed by his counsel to say nothing about the pending charges or any prior offenses.

Based on his studies and observations as well as those of other examiners, Dr. Galvarino, responding to a question from the prosecuting attorney, gave his opinion about Woomer's future dangerousness:

He's not insane. It is my opinion that Mr. Woomer does have an antisocial personality trait. That means that he will not conform to authority. He will not conform to the Law, furthermore, he will, in all liklihood [sic], if the situation will arise, repeat, over and over, the crimes that he has perpetrated in the past. This type of individual, in my opinion, they thrive on people's pain, and they will do their utmost in order to obtain their satisfaction, which, in this case, only can be obtained through people's suffering. I do not perceive any type of treatment for this type of individual.

Woomer argues that Dr. Galvarino's testimony on the issue of future dangerousness violated his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel because neither he nor his attorney were specifically advised that the evaluations might provide a foundation on which the examining psychiatrist could base this opinion.

### A.

The Supreme Court has previously held that future dangerousness is a permissible consideration in capital sentencing:

Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.' The Court has therefore held that evidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an 'aggravating factor' for purposes of capital sentencing. Likewise, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.

*Skipper v. South Carolina,* 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Jurek v. Texas,* 428 U.S. 262, 275, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976); and also citing *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)) (footnote omitted). The Court has further held that expert psychiatric testimony is generally admissible on the issue of predicting future dangerousness. *Barefoot,* 463 U.S. at 896–903, 103 S.Ct. at 3396–99. However, the psychiatric evidence must be obtained within the parameters of the fifth and sixth amendments as enunciated in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

The Court in *Estelle v. Smith* held that the fifth amendment privilege against self-incrimination applies to court-ordered custodial pretrial psychiatric examinations, stating that: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 101 S.Ct. at 1876. Any statements which are made by a defendant during such an examination cannot be used in a capital sentencing proceeding unless he was advised of his *Miranda* rights and knowingly waived them. *Id.* at 469, 101 S.Ct. at 1876. The Court further held that a defendant has a sixth amendment right to the assistance of counsel prior to a custodial court-ordered psychiatric evaluation, *id.* at 471, 101 S.Ct. at 1877, but this right does not extend to the presence of counsel during the examination. *United States v. Albright,* 388 F.2d 719,

726 (4th Cir.1968); *see Estelle v. Smith,* 451 U.S. at 470 n. 14, 101 S.Ct. at 1877 n. 14.

In *Estelle,* the defendant Smith was charged with murder for which the State of Texas sought the death penalty. Under Texas law, the death penalty could not be imposed unless the State proved that "there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Proc.Ann art. 37.-071(b)(2) (Vernon Supp.1980). Although defense counsel had not raised the issue of Smith's competency to stand trial or his sanity at the time he allegedly committed the crime, the trial judge *sua sponte* informally ordered a psychiatric examination to determine Smith's competency. Defense counsel was not given prior notice of the examination and did not become aware of it until the psychiatrist's report was discovered in the court files. The report indicated that Smith was competent to stand trial and classified him as "a severe sociopath," but no specific references were made concerning his future dangerousness. The State's sole witness at the sentencing phase was the examining psychiatrist who testified that Smith was an untreatable sociopath who would " 'commit other similar or same criminal acts if given the opportunity to do so.' " *Estelle,* 451 U.S. at 460, 101 S.Ct. at 1871. The Court concluded that use of this psychiatric testimony violated Smith's fifth amendment privilege against self-incrimination and his sixth amendment right to counsel since he had not been warned of his *Miranda* rights and his counsel had not been notified that an examination was to be conducted. *Id.* at 463, 471, 101 S.Ct. at 1873, 1877.

The Court has since limited its holdings in *Estelle* to the "distinct" facts of that case—"the trial judge had ordered, sua sponte, the psychiatric examination and Smith neither had asserted an insanity defense nor had offered psychiatric evidence at trial." *Buchanan v. Kentucky,* 483 U.S. ——, 107 S.Ct. 2906, 97 L.Ed.2d 336, 355 (1987). After his arrest on murder charges, Buchanan was committed, on joint motion of defense counsel and the State, for psychiatric treatment, not for a determination of his competency or sanity. *Id.* at —— n. 11, 107 S.Ct. at 2911 n. 11, 97 L.Ed.2d 347 n. 11. However, when Buchanan asserted the affirmative defense of extreme emotional disturbance at trial, the State presented psychiatric evidence gathered during that commitment in rebuttal. Although Buchanan had not been warned prior to the evaluation that any statement he made during the examination could be used against him at trial, the Court found no fifth or sixth amendment violation because defense counsel had joined in the State's motion for the psychiatric examination and Buchanan had asserted a mental status defense. *Id.* at —— ——, 107 S.Ct. at 2917–18, 97 L.Ed.2d 355–56.

Most recently, in *Satterwhite v. Texas,* 486 U.S. ——, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the Court was presented with two clear violations of the defendant's sixth amendment right to counsel. On motion of the State, the court ordered a psychological examination of the defendant to determine competency, sanity and future dangerousness before defense counsel was appointed. Subsequently, on further motion of the State, he was ordered reexamined without notice to the counsel who had been appointed in the interim.

## B.

■ As in *Buchanan,* it is equally clear here that Woomer's fifth and sixth amendment rights were not violated. First, his fifth amendment privilege against self-incrimination was preserved because, unlike Smith or Buchanan, Woomer was specifically advised of his rights. Although Woomer testified *in camera* that he had not been warned by hospital personnel that his statements made during the psychiatric evaluations could be used against him, he admitted that he had been advised by his defense counsel not to discuss the facts of the crimes or his prior offenses with the state hospital personnel and, in fact, had invoked his right to remain silent during one examination. Despite Woomer's denial, the South Carolina Supreme Court accepted the testimony of Dr. Galvarino, as

well as of the social worker and psychologist, that "they individually informed Woomer of his constitutional rights and that anything he said could be used against him in court." *State v. Woomer*, 278 S.C. at 472, 299 S.E.2d at 319. Based on this factual finding,[5] the district court correctly found that "the warnings given [Woomer] were a fully effective means 'to notify [him] of his right of silence and to assure that the exercise of the right [would] be scrupulously honored.' " *Woomer v. Aiken*, No. 86–1320, slip op. at 19 (D.S.C. July 1, 1987) (quoting *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630; and also citing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359).

Further, Woomer was not denied his right to counsel because his defense counsel requested one examination and expressly consented to the other and thus, similar to the situation in *Buchanan*, counsel was fully aware of both. And perhaps even more important, Woomer admitted that his attorney advised him of his rights regarding the examinations and that he acted on that advice by invoking his fifth amendment privilege at one point. Thus, unlike in *Estelle* and *Satterwhite*, counsel had actual notice of the examinations. And although Woomer argues that the notice was inadequate because neither he nor his counsel were specifically advised that the evaluations might produce a basis for comment on potential future dangerousness, such specific notice was not required.

If Woomer had been examined only to determine his competency, it appears that any resulting psychiatric evidence would have been limited under South Carolina law to that issue alone. S.C.Code Ann. § 44–23–420 (Law.Co-op.1976).[6] Arguably, notice of and consent to the psychiatric examination for "the limited, neutral pur-

pose of determining [a defendant's] competency to stand trial" would not have permitted the use of the results "by the State for a much broader objective that was plainly adverse to [the defendant]." *Estelle*, 451 U.S. at 465, 101 S.Ct. at 1874.[7] However, section 44–23–420 does not limit the use of evidence acquired during a sanity evaluation. When defense counsel consented to the sanity evaluation, he obviously anticipated that the evaluation and resulting psychiatric opinions might be beneficial to his client's case, but he also must have been fully aware that if they were unfavorable they might be used for an adverse objective. It is of little moment that counsel was not specifically advised that the evaluation might provide a basis for addressing the issue of Woomer's future dangerousness since Dr. Galvarino's opinion on that issue was predicated on the same information that was necessarily gathered to evaluate Woomer's sanity.

Given the facts that defense counsel requested a competency evaluation and consented to a sanity evaluation and that Woomer was repeatedly advised of his rights, the psychiatric testimony concerning his potential future dangerousness was not a violation of Woomer's fifth amendment privilege against self-incrimination or his sixth amendment right to counsel.

### III.

In both sentencing proceedings, Woomer urged the juries to consider four statutory mitigating circumstances which concerned his mental capacity at the time of the alleged crimes:

(2) The murder was committed while the defendant was under the influence of mental or emotional disturbance;

.    .    .    .    .

---

**5.** The state court finding is entitled to a presumption of correctness which Woomer does not attempt to rebut. 28 U.S.C.A. § 2254(d).

**6.** Section 420 provides in part: "The report of the designated examiners shall not contain any findings nor shall the examiners testify on the question of insanity should it be raised as a defense unless further examination on the question of insanity is ordered by the court."

**7.** Estelle was committed for the sole purpose of a competency evaluation and under Texas law, his statements could not be used against him on the issue of his guilt. 451 U.S. at 463 n. 6 (citing Tex.Code Crim.Proc.Ann. art. 46.02 § 3(g) (Vernon 1979)).

(5) The defendant acted under duress or under the domination of another person;

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

(7) The age or mentality of the defendant at the time of the crime;

. . . .

S.C.Code Ann. § 16–3–20(C)(b) (Law.Co-op. 1976). He now contends that he received ineffective assistance of counsel at the second sentencing proceeding because defense counsel failed to obtain and present expert testimony regarding his past drug use and its effect on his mental status and behavior to support these mitigating circumstances.

### A.

At the first sentencing proceeding, Woomer testified about a history of drug use which included amphetamines, valium, marijuana, quaaludes, and alcohol. He further testified that on the day of the murders he consumed quaaludes, valium, marijuana and alcohol. Woomer also presented testimony from two psychiatrists. Dr. Wayne Lockhart had examined Woomer in July 1979 at the request of defense counsel "to see if there could be determined any psychological factors that might help explain his behavior in regards to the offenses that he's been charged with." Dr. Lockhart diagnosed Woomer as having a drug dependency and an antisocial personality disorder and testified that he was not insane, but he was easily influenced, immature, and impulsive. Dr. Edmond Camp, who had examined Woomer in April 1979 at the request of defense counsel, noted Woomer's drug history and diagnosed an untreatable antisocial personality disorder. He further testified that Woomer did not have a conscience, stating that:

[B]oth legally and morally, [Woomer] knows the difference between right and wrong. It's simply that he doesn't care. . . . . He does what he wants to do, when he wants to do it, because he wants to do it, and if it's an illegal act and there are witnesses, then he simply kills them.

After receiving this evidence, which was offered in mitigation, the jury recommended a death sentence based on the aggravating factors of rape and kidnapping. As noted earlier, this death sentence was reversed because of insufficient jury charges and improper argument of the prosecuting attorney which are unrelated to this appeal.

At the second sentencing proceeding, neither Woomer nor Drs. Camp and Lockhart testified. This obviously tactical decision by Woomer and his counsel is easily understood after reviewing the testimony given in mitigation during the first sentencing proceeding and the resulting unfavorable jury decision. At the second sentencing proceeding, the evidence offered in mitigation centered on testimony from Woomer's mother regarding his allegedly troubled childhood and from three correctional officers concerning his good behavior during his interim incarceration in an attempt to show his adaptation to prison and that he would not pose a threat to those with whom he would have contact if given a life sentence. The issue of his prior drug use was pursued during cross-examination of Dr. Galvarino and briefly discussed by a former girlfriend. A second jury again recommended the death sentence based on the aggravating factors of rape and kidnapping.

Woomer raised the issue of ineffective assistance of counsel in his state post-conviction relief proceeding and presented the testimony of Dr. Harold Morgan, a forensic psychiatrist and Dr. Donald Allen, Chairman of the Department of Pharmacology at the University of South Carolina School of Medicine. Both Drs. Allen and Morgan testified that they were available and would have testified if called by Woomer at the second sentencing proceeding in 1981.

Based on his review of a summary of the previous trial testimony and an interview with Woomer, Dr. Allen stated that he would have testified concerning the potential psychological and emotional effects of the drugs Woomer had been using: "Based on what I know about the compounds, and based on what I know about the amounts

of the materials that he was consuming, it's my professional opinion that they had to have had an effect on his behavior." Dr. Allen further testified that the drugs "could have" affected his perception and reality, his impulse control, and his ability to control his behavior on the day of the murders. But, Dr. Allen conceded that there was no way he could determine whether Woomer was specifically under the influence of the drugs at the time of the crimes.

Dr. Morgan had examined Woomer in 1979 at the state hospital regarding his competency to stand trial on the Horry County charges. At the request of defense counsel, he also examined Woomer on the issues of sanity and possible mitigating circumstances regarding the Georgetown County charges. Dr. Morgan stated that he would have testified that Woomer was a heavy drug user with an antisocial personality disorder. He further stated that he would have testified that in his opinion there was a "substantial possibility" that at the time this murder was committed Woomer was under the influence of mental or emotional disturbance, that he was influenced by Skaar, and that his ability to appreciate the criminality of his conduct was substantially impaired. However, Dr. Morgan conceded that his impressions were not based on "a full comprehensive diagnostic work-up."

### B.

To successfully claim ineffective assistance of counsel, a defendant must establish two elements:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). As the state court and the district court properly found, Woomer has not made the requisite showing.

Woomer was represented at the first trial by three competent attorneys with more than 35 years combined legal experience who diligently, although ultimately unsuccessfully, pursued the issue of Woomer's drug history as evidence of mitigating circumstances. On remand he was again represented by one of the original attorneys and by an attorney who had successfully handled his direct appeal. Counsel was aware of Dr. Morgan from his reports in the state hospital files, and lead counsel testified that he "didn't see anything in the file that made [him] think [they] wanted to use him." Lead counsel also testified that he was aware of the availability of pharmacology experts and investigated that option, but did not pursue it. These decisions were not "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

At the second sentencing proceeding, defense counsel had the advantage of being able to evaluate prior tactics and anticipate the State's evidence. Since the issue of Woomer's drug use had been unsuccessfully pursued at the first trial, it was reasonable to take another approach. Thus, faced with the reality of the first proceeding coupled with the common knowledge that many find it difficult to view the illegal use of narcotics under any circumstances as a mitigating factor, and now armed with testimony that Woomer had adapted well to prison life, the decision, objectively viewed, was a reasonable and prudent approach for the defense to take. Further, presenting evidence of Woomer's good conduct in prison was sound trial strategy in an attempt to rebut Dr. Galvarino's testimony of his future dangerousness.

Further, Woomer has not demonstrated any prejudice from the alleged deficiency in counsel's performance. The State presented eyewitness testimony from a surviving victim which established the aggravating circumstances of kidnapping and rape, in addition to the expert testimony of Dr. Galvarino concerning Woomer's future dangerousness. Woomer expressly con-

ceded the kidnapping and rape and attempted to rebut the prediction of his future dangerousness. He has failed to "show that there is a reasonable probability that, but for" the absence of the general and speculative testimony of Drs. Allen and Morgan concerning Woomer's drug use, the jury would not have recommended a death sentence. *Id.* at 694, 104 S.Ct. at 2068. The absence of this evidence does not undermine our confidence in the jury's recommendation, *id.*, which was the same as that of the first jury which had such evidence presented to it.

## IV.

Woomer was advised of his rights prior to the psychiatric evaluations and his counsel had notice of the examinations. Admission of Dr. Galvarino's testimony did not violate Woomer's fifth amendment privilege against self-incrimination or his sixth amendment right to counsel. Further, he received the effective assistance of counsel at the second sentencing proceeding. Having found no constitutional violations, we affirm the denial of a writ of habeas corpus.

AFFIRMED.