503 S.E.2d 770

**The STATE, Respondent,**

v.

**Kevin BERRY, Appellant.**

**No. 2863.**

Court of Appeals of South Carolina.

Heard June 3, 1998.

Decided June 29, 1998.

Rehearing Denied Aug. 20, 1998.

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Charles H. Richardson, Columbia; and Solicitor Walter M. Bailey, Jr., Summerville, for respondent.

HOWELL, Chief Judge:

Kevin Berry appeals from his conviction for second-degree criminal sexual conduct. We reverse and remand for a new trial.

## I.

Viewed in the light most favorable to the State, the evidence established the following. At approximately 3:00 a.m. on August 14, 1995, the victim, a 42–year old female, was walking down a sidewalk near "The Hill" in Orangeburg. The victim was returning to her home after unsuccessfully attempting to purchase beer from a nearby bootlegger. When a bottle was thrown in front of her, the victim noticed a man standing nearby. The victim commented, "Goodness, I hope you wasn't throwing to hit me," and continued walking. The man grabbed the victim around the throat and pulled her into some nearby bushes. The victim screamed, but the assailant covered her mouth and told her he would kill her if she screamed again. The assailant removed the victim's shorts and underwear and forcibly engaged in sexual intercourse with her. When he instructed the victim to lie face down in the dirt, she managed to run away, wearing only her unsnapped bodysuit.

The victim ran to the home of Freddie Mack and Mary Green, where she was staying at the time. According to Mack

and Green, the victim was very upset, and she insisted on returning to the scene to try to find her glasses. Mack, Green, and the victim then left the house to call the police and to look for the victim's belongings.

When Mack arrived at the scene, he saw Berry standing near the bushes. Mack informed Berry that the victim said she had just been raped, and Berry said he had not seen anyone other than the victim come through the area. Mack testified that he stopped Berry from removing some clothes and shoes that were in the bushes.

The victim saw Berry at the scene, and she told Mack that Berry was her assailant. Her shorts, underwear, glasses, and pocketbook were found at the scene.

A rape protocol examination of the victim revealed the presence of semen and a small abrasion under the victim's chin. No other wounds or injuries were discovered. DNA analysis identified Berry as the source of the semen. A blood test revealed that the victim's blood alcohol level was 0.123 percent.

At trial, Berry testified that he paid the victim $10 to have sex with him that night. According to Berry, the victim wanted the money to purchase crack cocaine.

## II.

Over Berry's objection, the trial court allowed the State to present the testimony of Rosa Polite, a 59–year old woman who lived in the same area as Berry and the victim. Polite claimed that Berry tried to sexually assault her on Thanksgiving morning, less than one week before Berry's trial. On appeal, Berry contends the evidence of the Thanksgiving incident was improperly admitted, because it was not sufficiently similar to the attack on the victim. We agree.

## A.

At trial, Polite testified that she heard knocking at her door sometime between 6:30 and 7:00 a.m. on Thanksgiving day. When she opened the door, Berry grabbed her by the throat and said, "Be still and let me do what I'm going to do, [or] I'll knock you out." Polite testified that Berry "knocked" her in

the face and arms and kicked her legs, and that he broke her glasses during the struggle. When Berry put his hands in her underwear, Polite told him she had AIDS. She escaped when he allowed her to get up to wash her hands.

Polite reported the attack to the police shortly after 7:00 that morning, identifying Berry as her assailant. Approximately an hour later, Berry called the police and told them that he had gone to Polite's house to buy bootleg beer.[1] According to Berry, when he told Polite she owed him more change, she attacked him, scratching his face. He then pushed Polite, which caused her to fall on her side.

### B.

■ As a general rule, evidence of other crimes or bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE; *see generally State v. Hough*, 325 S.C. 88, 480 S.E.2d 77 (1997); *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). Evidence of other bad acts, however, is admissible to prove "motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Rule 404(b), SCRE; *accord Hough*, 325 S.C. at 94–95, 480 S.E.2d at 80; *Lyle*, 125 S.C. at 416, 118 S.E. at 807. The evidence of the other crime or bad act must be clear and convincing. *State v. Parker*, 315 S.C. 230, 433 S.E.2d 831 (1993); *State v. Smith*, 300 S.C. 216, 387 S.E.2d 245 (1989).

■ The only exception to the prohibition against evidence of other bad acts arguably applicable in this case is the common scheme or plan exception. For this exception to apply,

> a close degree of similarity or connection between the prior bad act and the crime is necessary. The connection between the prior bad act and the crime must be more than just a general similarity. A common scheme or plan concerns more than the commission of two similar crimes; some connection between the crimes is necessary.

---

1. At trial, Polite denied that she sold beer to Berry that morning and denied that she ever sold bootleg beer or liquor. On cross-examination, however, she admitted that she was convicted in 1987 of selling illegal liquor.

*State v. Timmons,* 327 S.C. 48, 52, 488 S.E.2d 323, 325 (1997) (citations omitted); *accord State v. Jenkins,* 322 S.C. 414, 472 S.E.2d 251 (1996); *State v. Parker,* 315 S.C. 230, 433 S.E.2d 831 (1993).

▉ In this case, there are insufficient similarities between the attack on the victim and the attack on Polite to connect the incidents as part of a common scheme or plan. The incidents occurred fifteen months apart, under different circumstances, at different times, in different places, and in different ways. That both women coincidentally wore glasses and both claimed Berry grabbed their throats does not render the attacks sufficiently connected or similar to justify admission of evidence of the Polite incident under the common scheme or plan exception. Accordingly, we conclude that the trial court erred by allowing the State to introduce evidence of the Polite incident.[2] *See Lyle,* 125 S.C. at 417, 118 S.E. at 807 ("Whether the requisite degree of relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors. Hence, if the Court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected."); *State v. Davenport,* 321 S.C. 134, 138–39, 467

---

2. To the extent the trial court allowed introduction of the Polite incident as evidence of Berry's motive, it was likewise error. That Berry allegedly assaulted Polite in no way establishes a motive for the assault on the victim. Instead, evidence of the attack on Polite serves only to demonstrate that Berry "acted in conformity with his propensity to commit crimes, ... in direct contradiction of *Lyle.*" *Hough,* 325 S.C. at 95, 480 S.E.2d at 81; *see State v. Nelson,* 331 S.C. 1, 12, 501 S.E.2d 716, 721 (1998) (Rejecting argument that evidence showing defendant was a pedophile was admissible to show defendant's motive in sexually assaulting a young child: "[T]he State's argument [that] this evidence was relevant to show motive or intent is merely a cleverly disguised way of asserting [the defendant] committed the crimes because he has a propensity to commit sexual offenses."); *State v. Stokes,* 279 S.C. 191, 193, 304 S.E.2d 814, 815 (1983) ("[T]he rationale for excluding evidence of prior 'bad acts' is to prevent the jury from considering an accused's inclinations rather than his actual conduct in the incident before the court."). We note, however, that the State argues in its brief only that the evidence is admissible under the common scheme or plan exception.

S.E.2d 258, 261 (Ct.App.1996) ("We cannot clearly perceive the connection between the acts based on these criteria, and we therefore conclude Stephens's testimony should have been excluded.").

## C.

While we have concluded that the trial court erred by admitting evidence of the Polite incident, we must now determine whether that error requires reversal or whether the error can be considered harmless. *See, e.g., Parker,* 315 S.C. at 234, 433 S.E.2d at 833 (improper admission of evidence of other bad acts is subject to harmless error analysis); *accord State v. Livingston,* 282 S.C. 1, 317 S.E.2d 129 (1984). Whether the improper introduction of this evidence is harmless requires us to look at the other evidence admitted at trial to determine whether the defendant's "guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached." *Parker,* 315 S.C. at 234, 433 S.E.2d at 833; *see also State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) (Error is harmless if it could not reasonably have affected the result of the trial.); *accord State v.. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App.1997).

Clearly, there is evidence that tends to establish Berry's guilt. The victim testified that Berry raped her. Mack and Green corroborated much of the victim's story, testifying that the victim returned home "practically naked" and very upset, claiming that she had been raped. The victim's shorts, underwear, glasses, and pocketbook were found at the scene of the attack, and, according to Mack, Berry was trying to remove the clothes. The victim became upset when she saw Berry at the scene and she told Mack that Berry was the man who raped her. The medical examination revealed a small abrasion under the victim's chin and sand on her back, both of which were consistent with her description of the attack. Finally, there was evidence that Berry threatened the victim after the incident and that he offered to pay the victim if she would drop the charges.

Berry, however, presented evidence tending to establish that the encounter between him and the victim was purely consensual. Berry testified that he paid the victim $10 to

have sex with him and that she was going to use to the money to buy crack cocaine. That he remained at the scene and did not flee when the victim, Mack, and Green returned is consistent with his defense. Moreover, the victim's blood alcohol level indicates that she was intoxicated at the time of the incident. Her intoxication offers some explanation for her behavior if, as Berry contends, the encounter was a consensual, albeit commercial, transaction.

In addition, there were certain inconsistencies in the evidence presented by the State. For example, the victim testified that she, Mack, and Green left the house, and Green took her to call the police while Mack went to the scene of the attack. The victim said that she and Green joined Mack after they called the police. Mack, however, testified that he and the victim left the house to go to a phone to call the police, and that Green followed later. There were also discrepancies in the testimony of the victim, Mack, and Green as to the time the victim left the house and how long she was gone before she returned claiming she had been raped.

Moreover, the victim testified that Berry was still at the scene when the police arrived, and that Berry ran when the police shined a spotlight on him. The officer on the scene, however, testified that he never saw a suspect fleeing from him. The victim also testified at trial that, while she knew Travis Berry, Berry's brother, before the assault, she did not know that Berry was Travis's brother. However, the victim gave the police a statement shortly after the attack indicating that she knew at the time of the attack that her assailant was related to Travis. Finally, the credibility of the victim was called into question with evidence of her convictions for distribution of crack cocaine in proximity of a school and for escape.

These credibility questions and inconsistencies in the witnesses' testimony make it impossible for this Court to conclude that, without reference to the Polite incident, the evidence of Berry's guilt is overwhelming or that Berry's guilt is the only rational conclusion that could be reached from the evidence presented. Evidence of the attack on Polite amounted to a prejudicial attack on Berry's character and credibility, issues that were central to Berry's defense. Thus, we cannot conclude that the improper admission of evidence of the Polite

incident was harmless. *See State v. Smith,* 309 S.C. 442, 447, 424 S.E.2d 496, 499 (1992) ("The [improperly admitted] 'prior cocaine use' testimony was so destructive to [the defendant's] character, hence her credibility, that it cannot be held harmless error or cumulative."); *Reeves,* 301 S.C. at 194, 391 S.E.2d at 243 ("Error which substantially damages the defendant's credibility cannot be held harmless where such credibility is essential to his defense."); *State v. Gray,* 304 S.C. 482, 405 S.E.2d 420 (Ct.App.1991) (improper questions involving defendant's assertion of right to remain silent could not be considered harmless where questions intended to impeach defendant's testimony and credibility of defendant and witness was central issue); *cf. Parker,* 315 S.C. at 234, 433 S.E.2d at 833 (improperly admitted evidence of other bad acts did not require reversal because evidence of the defendant's guilt was overwhelming without reference to the improperly admitted evidence). Accordingly, we hereby reverse Berry's conviction and remand for a new trial.[3]

**REVERSED and REMANDED.**

CURETON and GOOLSBY, JJ., concur.

---

3. Given our disposition of this issue, we need not address the other issues raised by Berry. The trial court is free to consider those issues *de novo* should they arise on retrial.