551 S.E.2d 286

The STATE, Respondent,

v.

Claude and Phil HUMPHRIES, Appellants.

No. 3380.

Court of Appeals of South Carolina.

Heard Feb. 7, 2001.

Decided Aug. 6, 2001.

436

Assistant Appellate Defender Aileen P. Clare, of SC Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh and Assistant Attorney General Melody J. Brown; and Solicitor C. Kelly Jackson, of Sumter, for respondent.

CURETON, Judge:

In this criminal case, Claude and Phil Humphries appeal from their convictions for trafficking marijuana on the grounds that the trial court erred in refusing to compel the State to disclose the identity of its confidential informant and in admitting evidence of other bad acts. We affirm.[1]

## FACTS/PROCEDURAL BACKGROUND

In October of 1996, the Sumter County Sheriff's Department received a tip that a package containing illegal drugs would be delivered to C & J Automotive from an address in California. Deputies of the sheriff's department intercepted the package while it was en route with the United Parcel Service (UPS). The package, addressed to C & J Automotive, contained approximately 40 pounds of marijuana with a street value of approximately $60,000. Police repackaged the drugs and made a controlled delivery using a South Carolina Law Enforcement Division (SLED) agent disguised as a UPS driver. Phil accepted the package, and stated he was signing for the garage's owner, Claude. Officers then executed a search warrant and seized the package, files, ledgers, and $4,500 in U.S. currency. Both Phil and Claude were present during the search.

The Sumter County Grand Jury indicted the Humphries on charges of criminal conspiracy and trafficking in more than ten, but less than one hundred pounds of marijuana. During

---

1. This case was previously affirmed in an unpublished opinion. *State v. Humphries*, 2000–UP–336 (Ct.App.2000). It is now being considered on the grant of the Humphries' petition for rehearing.

their trial on the trafficking charges, the Humphries moved to have the State reveal the identity of the confidential informant. After argument from both sides, the trial court refused to grant the motion, reasoning it did not have enough information to determine whether the State was required to disclose the informant's identity. The trial court also refused to exclude evidence the Humphries had trafficked marijuana on other occasions.

The Humphries were convicted of trafficking in marijuana and each sentenced to twenty-five years imprisonment and required to pay a $25,000 fine. This appeal follows.

## LAW/ANALYSIS

### I. Confidential Informant

■ The Humphries argue the trial court erred by refusing to compel the State to disclose its informant's identity. We disagree.

■ The State is ordinarily privileged from disclosing the name of a confidential informant. *State v. Wright*, 322 S.C. 484, 472 S.E.2d 642 (Ct.App.1996). However, the State may be compelled to reveal an informant's identity where the informant is either an active participant in a criminal transaction or a material witness to the question of the defendant's guilt or innocence. *State v. Batson*, 261 S.C. 128, 198 S.E.2d 517 (1973).

In this case, the Humphries put forth three possible grounds for compelling the State to disclose the informant's identity: the informant may have framed or mis-identified the defendants, there was no informant, or the informant was part of the drug transaction. The State asserted the informant was merely a tipster. The court found nothing to support an inference that the informant was anything other than a tipster, but agreed to revisit the issue if during trial it appeared the informant was either an active participant in the crime or a material witness on the issue of guilt or innocence.

The informant in this case merely provided law enforcement with the reasonable suspicion necessary to seize the package destined for C & J Automotive and expose it to a drug dog. Nothing in the record indicates that the informant was pres-

ent during law enforcement's inspection of the package or its controlled delivery to the garage. Accordingly, we find no error in the trial court's determination that the informant was a mere tipster and its decision to deny the motion to reveal his identity. *See State v. Burney*, 294 S.C. 61, 362 S.E.2d 635 (1987) (declining to compel the identification of a "tipster."); *State v. Blyther*, 287 S.C. 31, 336 S.E.2d 151 (Ct.App.1985) (recognizing that the State is not required to disclose the identity of a "mere tipster").

## II. Evidence of Other Trafficking Incidents

The Humphries also argue the trial court erred in admitting prejudicial character evidence prohibited by *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923) "because it was irrelevant and more prejudicial than probative." We agree but conclude the admission was harmless error.

Initially, we address the State's contention that this issue is not preserved for appellate review. Prior to trial, the defense made a motion *in limine* to exclude evidence of other drug trafficking by the Humphries as being improper evidence of other bad acts and violative of *State v. Lyle*. The State opposed the motion by arguing the evidence was admissible to show a common plan or scheme. After hearing the proposed evidence, the trial court ruled *in limine* for the State. In its ruling, the court stated to defense counsel: "I am sure that you take exception to that ruling and I will tell you that your position is protected without the necessity of further objection on forward." The evidence was later admitted without objection during the Humphries' trial.

Ordinarily, an evidentiary ruling *in limine* is not final, thus the opposing party must object to the introduction of the evidence at trial in order to preserve the objection for appellate review. *State v. Mitchell*, 330 S.C. 189, 498 S.E.2d 642 (1998). In this case, the trial court indicated its ruling *in limine* was final and instructed the defense that it need not object to the evidence when it was introduced at the time of the admission. For this reason, the issue is preserved notwithstanding the Humphries' failure to raise an objection at trial. *See State v. Wilson*, 337 S.C. 629, 524 S.E.2d 411 (Ct.App.1999), *rev'd on other grounds by, State v. Wilson*, 345

S.C. 1, 545 S.E.2d 827 (holding that a contemporaneous objection to the introduction of testimonial evidence was not required to preserve the issue for appellate review where the trial court made its final evidentiary ruling following an *in camera* hearing); *see also State v. Pace*, 316 S.C. 71, 447 S.E.2d 186 (1994) (excusing the failure to make a contemporaneous objection where the judge's comments are such that any objection would be futile).

As to the merits, during the *in limine* hearing, the State offered the testimony of a former C & J employee, Jeff Seruya. Seruya testified that during his employment he was instructed not to open certain packages delivered to C & J. Seruya became suspicious about the packages due to the heavy traffic of "undesirable people" through the garage and his perception that C & J was under police surveillance. Acting on his suspicions, Seruya secretly opened one of the packages and found that it contained marijuana. He then decided to leave his employment "because things were getting too hot around there." Sometime after Seruya left C & J, Claude and Phil were arrested and charged with the instant offense.

Seruya also testified *in limine* that a few days after Claude and Phil's arrest, Claude contacted him and asked if he would take delivery of an Airborne Express package.[2] Seruya testified that Ray, Claude's acquaintance, delivered a box to his home and told him the box belonged to Claude. Shortly after the delivery, Seruya was arrested and the box, containing approximately twenty pounds of marijuana, was opened by law enforcement officers. With officers listening in, Seruya then telephoned Claude and asked him to come and retrieve his box. Claude agreed and arrived with another man to collect it.

Dexter McGee, a narcotics investigator with the sheriff's department, also testified *in limine* for the State, but provided a slightly different explanation of Seruya's arrest. Investigator McGee indicated his office learned from the Drug Enforcement Agency (DEA) that a package containing marijuana

---

2. Although Seruya testified *in limine* only that "Mr. Humphries" contacted him about the Airborne Express package, it appears from his trial testimony that he was referring to Claude.

was being shipped to Seruya's residence via Airborne Express. Acting on the tip, the sheriff's department performed a controlled delivery of the package, arrested Seruya, and then had him call C & J. Claude answered the phone and said he would come get the box later in the day. Claude and Peter Jenkins, a C & J employee, later picked up the box.

At trial, Seruya testified that during his employment with C & J he was instructed to not open certain packages which came from California. However, he did not testify, as he had *in limine*, that he opened one of the packages against those instructions and found marijuana. As to the box delivered to his house, Seruya testified at trial that it arrived wrapped in plain brown paper without a packing list, as had the suspect packages he saw at C & J. However, unlike the C & J packages, the box contained no stickers or labels indicating who it was for, where it was destined, or from where it originated. He testified that the box was for Claude, but did not explain how he knew it was for him or where the box came from. Seruya also claimed to have opened the box, found marijuana inside, and called Claude to come and retrieve it. Seruya described how Claude and Peter Jenkins arrived at his home and how Claude waited in the car as Peter came inside and retrieved the box.

McGee did not testify to the latter transaction at trial. The State offered no evidence at trial concerning Seruya's arrest or that his call to Claude was monitored by the police. In its brief, the State concedes "[t]he trial judge's ruling on the admissibility of Seruya's testimony was based upon the *in camera* testimony of Seruya and McGee." [3] The Humphries

3. This case illustrates the difficulty inherent in issuing a final evidentiary ruling before the evidence is offered at trial. Seruya's trial testimony varied so markedly from his pre-trial testimony as to suggest that the trial court may have ruled differently had it considered only the former. Nevertheless, we must review the trial court's evidentiary ruling in light of the evidence actually admitted at trial, not what was offered before trial. *See State v. Nelson,* 331 S.C. 1, 5 n. 4, 501 S.E.2d 716, 718 n. 4 (1998) (suggesting an appellate court should review evidentiary rulings based on the evidence entered at trial rather than the evidence presented at a motion *in limine* hearing). A motion *in limine* seeks a pretrial evidentiary ruling to prevent the disclosure of potentially prejudicial matter to the jury. *State v. Hill,* 331 S.C. 94, 501 S.E.2d 122 (1998). A pretrial ruling *in limine* is not final; unless an objection is made at the

argue that all evidence regarding the post-arrest delivery of a package to Seruya's house was improperly admitted under *Lyle.*

Evidence of other crimes or bad acts is inadmissible to prove a person's character or guilt for the charged offense unless the evidence tends to establish, *inter alia,* a common scheme or plan. *See* Rule 404(b), SCRE; *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *Lyle,* 125 S.C. 406, 118 S.E. 803. The common scheme or plan exception requires "a close degree of similarity or connection" between the other bad act or crime and the charged offense. *State v. Timmons,* 327 S.C. 48, 52, 488 S.E.2d 323, 325 (1997). A general similarity between the offenses is not enough; "some connection between the crimes is necessary." *Id.* at 52, 488 S.E.2d at 325.

Evidence of other crimes must be put to a rather severe test before admission. The acid test of admissibility is the logical relevancy of the other crimes. The trial judge must clearly perceive the connection between the other crimes and the crimes charged. Further, other crimes which are not the subject of conviction must be proven by clear and convincing evidence.

*State v. Cutro,* 332 S.C. 100, 103, 504 S.E.2d 324, 325 (1998) (citations omitted).

Our supreme court addressed the common plan or scheme exception within the context of a drug trafficking prosecution in *State v. Raffaldt,* 318 S.C. 110, 456 S.E.2d 390 (1995). The *Raffaldt* court reviewed the admission of testimony about the defendant's prior drug dealing as it related to the charged offense of trafficking in cocaine. The cocaine at issue came to the defendant from New York via a series of transactions which began when Mr. Jiminez brought the cocaine into South Carolina and gave it to Mr. Kelly, who, along with Mr. Burchett, then delivered the cocaine to the defendant, who paid Kelly for the drugs. After retaining a portion of the

---

time the evidence is offered and a final ruling procured, the issue is not preserved for review. *State v. Mitchell,* 330 S.C. 189, 498 S.E.2d 642 (1998). Under the posture of this case, we must presume the Humphries objected to the evidence at issue and the trial court overruled the objection.

money, Kelly then paid Jiminez. *Id.* At trial, Burchett testified he had purchased marijuana and cocaine from the defendant on several occasions in the year preceding the commission of the charged offense. Burchett also testified that he had set up other cocaine deals between Kelly and the defendant prior to the charged offense. *Id.*

The trial court held that the testimony concerning the defendant's prior drug dealing was admissible under the common plan or scheme exception because it was not only "quite similar to" the charged offense, but it also "gave rise to" his connection with Kelly and Burchett, who facilitated the transaction between the defendant and Jiminez. *Id.* at 114, 456 S.E.2d at 392. Because the prior trafficking was the genesis of the charged offense, the court found sufficient similarity and connection to employ the common plan or scheme exception.

In keeping with *Raffaldt*, this court has refused to employ the common plan or scheme exception for prior drug transactions which were similar to the charged offense and involved the same actors, but were otherwise unconnected.

In *State v. Carter*, 323 S.C. 465, 476 S.E.2d 916 (Ct.App. 1996), this court rejected the use of the exception to introduce testimony concerning a prior drug transaction where the defendant was tried on a single charge of distribution. "[T]estimony of a prior drug sale using a similar sales technique is not relevant to prove a single charge of distribution." *Id.* at 468, 476 S.E.2d at 918. In *Carter*, the defendant was arrested for selling crack cocaine to an informant on January 18th. At trial, the informant testified that he agreed to participate in the defendant's arrest because the police had arrested him on January 14th after he had left the defendant's house with crack, which he claimed to have purchased from the defendant. This court held the evidence was inadmissible, reasoning:

There is no legal connection between these two purchases sufficient to come within the framework of the common scheme or plan exception. Indeed, the purpose of the State's use of the evidence appears ... [to have been] to convince the jury that because Carter sold crack cocaine to [the informant] on January 14th, he was selling crack co-

caine on January 18 <sup>th</sup>. This is the precise type of inference prohibited by *Lyle.*

*Id.* at 468, 476 S.E.2d 916, 476 S.E.2d at 918. The court further stated that if the trial court "does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, *the accused should be given the benefit of the doubt, and the evidence should be rejected.*" *Id.* at 469, 476 S.E.2d at 919 (quoting *State v. Lyle,* 125 S.C. 406, 417, 118 S.E. 803, 807 (1923)).

*Carter* relied heavily on *State v. Campbell,* 317 S.C. 449, 454 S.E.2d 899 (Ct.App.1994). In *Campbell,* the defendant was charged with distributing crack cocaine. The defendant was arrested at the home of an informant who, in cooperation with the police, had summoned the defendant by "beeping" him. *Id.* The defendant arrived at the informant's home with three yellow rocks which appeared to be crack cocaine; however, the substance was never positively identified because the defendant retrieved the rocks from the police during the arrest and swallowed them. *Id.* At trial, the informant testified he originally purchased crack from the defendant on the street, but that the defendant had given him a beeper number to facilitate subsequent transactions. *Id.* The informant claimed that prior to the arrest, he had used the same beeper number on several occasions to summon the defendant who would then arrive at his home and sell him crack. *Id.* This court held "testimony . . . of prior drug sales utilizing a similar sales technique" was insufficient to meet the common plan or scheme exception. *Id.* at 451, 454 S.E.2d at 901. Specifically, the court stated:

> The methodology of prior sales is not relevant to prove this transaction. . . . By introducing the prior bad acts, the State was not trying to prove a common scheme but to convince the jury that because Campbell sold crack cocaine in the past, he was selling crack cocaine on this occasion. This is precisely the type of inference that *Lyle* prohibits.

*Id.* at 451, 454 S.E.2d at 901.[4]

In this appeal, the Humphries do not appeal the requirement that the other bad acts be established by clear and

---

4. *But cf. State v. Moultrie,* 316 S.C. 547, 451 S.E.2d 34 (Ct.App.1994). In *Moultrie,* the defendant was charged with possession of marijuana

convincing evidence. Thus, we may not consider the sufficiency of the evidence regarding whether or not the prior bad acts were proven by clear and convincing evidence. *See State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (concluding an appellate court does not review a trial court's ruling on the admissibility of other bad acts by determining *de novo* whether the evidence rises to the level of clear and convincing; if there is any evidence to support the admission of the bad act evidence, the trial court's ruling will not be disturbed on appeal).

■ The Humphries do argue in this appeal that even if the bad act evidence was otherwise admissible, it was not relevant or probative to show they trafficked in marijuana on October 1, 1996. The Humphries were convicted of a single act of drug trafficking because a package of marijuana of sufficient weight to satisfy the statutory definition of trafficking, addressed to C & J, was mailed from California and delivered to C & J. To the extent that Seruya testified about the arrival of other, similar packages from California during the tenure of his employment with C & J, that testimony would appear to fall within the ambit of the common plan or scheme exception. However, Seruya's testimony concerning the delivery of marijuana to his home on Claude's behalf without other identifying similarities to the C & J deliveries is not sufficiently relevant or probative to warrant its admission into evidence under the common plan or scheme exception. At most, Seruya's testi-

with intent to distribute. The police, acting on information from an informant, observed eight people standing around the defendant's car while it was parked in front of his house. When the police approached, they saw marijuana on the ground near the defendant's car. The defendant was arrested. At trial, the court allowed the informant to testify that the defendant had a practice of selling drugs from a bag which he kept either under his car or in the woods near his house.

On appeal, the defendant argued the evidence should have been excluded under *Lyle*. This Court held the issue was not preserved as no objection was made at the trial. However, the Court concluded that the evidence was admissible under the *Lyle* common plan or scheme exception to prove the existence and nature of the defendant's drug trafficking scheme and was probative of his conduct with respect to the crime for which he was on trial. In so holding, the Court stated, the defendant's "mode of operation" in previous drug deals "bore an extraordinary similarity to the evidence [the police] discovered on the night of [the defendant's] arrest and tended to show the nature and content of [the defendant's] previous drug dealing." *Id.*

mony suggests that after Claude and Phil's arrest, they enacted another scheme to traffic in drugs. The new trafficking scheme was not sufficiently connected to the earlier scheme to warrant its introduction at trial pursuant to the common scheme or plan exception.

Based on this Court's reasoning in *Carter* and *Campbell*, the evidence of the subsequent bad acts in this case does not have the requisite connection to the charged offense to meet the common plan or scheme exception. Furthermore, *Raffaldt* is distinguishable from the instant action in that the other bad acts at issue in *Raffaldt* were not only "quite similar" to the charged offense, but also "gave rise" to that offense. Such a connection was not present in *Carter* and *Campbell* which, at best, merely involved the same parties undertaking similar transactions. The instant action is even further removed from *Raffaldt* because Seruya's trial testimony did not indicate the delivery to his home was sufficiently similar to the deliveries to C & J. Seruya never indicated he was involved with any of the packages delivered to C & J, whereas he was a direct participant in the delivery to his house. Furthermore, Seruya's description of the box delivered to his home is markedly different from his description of the packages received at C & J. Such discrepancies between the transactions in the instant action defeat both the similarity prong found in *Carter, Campbell,* and *Raffaldt* as well as the connection prong in *Raffaldt.*

■ Having concluded the trial court erred in admitting evidence of the subsequent delivery of marijuana to Seruya's home, we now consider whether that error requires reversal or whether the admission may be considered harmless error. *See State v. Berry,* 332 S.C. 214, 503 S.E.2d 770 (Ct.App.1998) (concluding improper admission of evidence of other bad acts is subject to harmless error analysis). To make that determination we must look to the other evidence admitted at trial to determine whether the Humphries' guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached. *See State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989).

Clearly, there is undisputed evidence, without reference to the subsequent bad act evidence, that conclusively proves the Humphries' guilt as to the indicted offense. Along with other

evidence, there was Seruya's testimony of the delivery of similar packages from California and the Humphries' directive forbidding him from opening those packages; law enforcement's interception of one of the packages from California that contained forty pounds of marijuana; the controlled delivery of that package to a garage operated by the Humphries; the acceptance of the package by Phil Humphries, and the search of the garage and the discovery of $4,500 that tested positive for marijuana. We hold that the erroneous admission of the bad acts evidence did not unfairly prejudice the Humphries in view of Seruya's unchallenged testimony that there had been other packages, similar to the package the Humphries were convicted for receiving, that had been delivered to C & J.

## CONCLUSION

Although the trial court properly allowed the State to withhold the confidential informant's name, it erred by admitting evidence of the subsequent drug delivery to Seruya's home. Nevertheless, we hold that there is overwhelming evidence of the Humphries' guilt without reference to the erroneously admitted evidence and accordingly affirm the convictions.

**AFFIRMED.**

HUFF, J. concurs.

ANDERSON, J., concurs in result only in a separate opinion

ANDERSON, Judge (concurring in result only):

Although I agree that the convictions of Claude and Phil Humphries should be affirmed, I write separately to express my concernment over the majority's holding that the admission of Seruya's testimony regarding marijuana being delivered to his house for the Humphries is not sufficiently similar to or connected to the charged offense and, thus, does not fit into the common scheme or plan exception to *Lyle*. The majority concludes this erroneous admission is harmless. The problematic aspects of the court's reasoning in support of its conclusion are all the more troubling because the analysis is fundamentally flawed. I find the admission of the subsequent

bad acts evidence was not error and would AFFIRM the rulings of the trial judge and the convictions of Claude and Phil Humphries without resorting to a harmless error analysis.

## STANDARD OF REVIEW

In *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001), the Supreme Court articulated the appropriate standard of review on appeal in determining the admissibility of bad act evidence:

In criminal cases, the appellate court sits to review errors of law only. *State v. Cutter,* 261 S.C. 140, 199 S.E.2d 61 (1973). We are bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000). This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases. For instance, in order for a confession to be admissible, the State must prove a voluntary waiver of the defendant's *Miranda* rights by a preponderance of the evidence. *State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244 (1990). On review, we are limited to determining whether the trial judge abused his discretion. *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998); *State v. Rochester, supra.* This Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *See In re Corey D.,* 339 S.C. 107, 529 S.E.2d 20 (2000)(an abuse of discretion is a conclusion with no reasonable factual support).

Similarly, we do not review a trial judge's ruling on the admissibility of other bad acts by determining *de novo* whether the evidence rises to the level of clear and convincing. If there is any evidence to support the admission of the bad act evidence, the trial judge's ruling will not be disturbed on appeal.

*Wilson,* 345 S.C. at 6, 545 S.E.2d at 829 (footnotes omitted).

## IN LIMINE TESTIMONY/ TRIAL TESTIMONY

Prefatorily, I agree with the majority that the ruling on the admissibility of the challenged evidence must be analyzed

pursuant to the trial testimony. Generally, a motion *in limine* seeks a pretrial ruling preventing the disclosure of potentially prejudicial matter to the jury. *State v. Mueller,* 319 S.C. 266, 460 S.E.2d 409 (Ct.App.1995). The *in limine* ruling by the trial judge and the testimony encapsulated within that proceeding is, in essence, a temporary decision on admissibility. A ruling *in limine* is not a final ruling on the admissibility of evidence. *State v. Floyd,* 295 S.C. 518, 369 S.E.2d 842 (1988). Evidence developed during trial may warrant a change in the *in limine* ruling. *See State v. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App.1997). The final ruling on admissibility of evidence is nexed directly to trial testimony.

## FACTUAL BACKGROUND

At the Humphries' trial, Sergeant Dexter McGee, with the Narcotics Unit of the Sumter County Sheriff's Department, testified regarding the package containing marijuana which was delivered to C & J Automotive. On October 1, 1996, officers with the Sheriff's Department received a tip "that a package ... was coming in from California[,] was possibly containing illegal narcotics and was to be delivered at C and J Automotive." Officers "intercepted" the package from the carrier, which was UPS.

The package contained approximately forty pounds of marijuana valued at about "$60,000 on the street." The package was addressed to C & J Automotive at 330 Fort Street in Sumter, South Carolina. The return address was Cocoas Car Care Accessories in Ventura, California. Inside the box, the marijuana was wrapped in plastic wrap, inside a trash bag, which was wrapped in fabric softener and packaged in cushioned material. According to Terry Proctor, K–9 Unit Supervisor with the Sheriff's Department, the package was a brown cardboard box with "strapping tape" on it.

Jeffrey Seruya, a former manager of C & J Automotive, testified at trial regarding (1) packages mailed to C & J when he was an employee and (2) a package of marijuana delivered to his house after the arrest of the Humphries. Seruya quit working at C & J because of his "suspicions of involvement in illegal activity." He stated "a lot of boxes" were delivered to C & J. Seruya declared "Mr. Humphries" instructed him not

to open certain packages. Seruya claimed the boxes he was ordered not to open looked like the box the police seized from C & J Automotive the day the Humphries were arrested on the current charge. The following exchange occurred between the Solicitor and Seruya:

Q: What is it about this box [the package seized from C & J by the police] that's similar to those boxes; if you could explain to the jury.

A. Plain box. Brown box. Lot of times have things written on them. Sometimes you would have a little-you know-label thing like this or that or whatever on it or stuff like this. You know.

Usually when you get a real packing list, it's enclosed in a plastic envelope style-you know-to let you know the contents of what is in the box.

Most of the other boxes didn't have any of those significant traits like you would see from a normal delivery.

The boxes Seruya was not allowed to open were all mailed from California. The boxes were plain with automotive stickers on them.

The package containing marijuana which was delivered to Seruya's house after the Humphries' arrest was "kind of like the other boxes. No packing list. Plain brown wrap-you know-box." There were no stickers, "definite markings," or addresses on this box. The label had been pulled off. Seruya testified the package was for Claude Humphries. Seruya opened the box and discovered it contained marijuana. He called Claude and told him "to come get this box." Claude and Peter Jenkins, an employee of C & J, drove to Seruya's house to pick up the box. While Jenkins retrieved the box from Seruya, Claude waited in the truck but waved to Seruya.

## COMMON SCHEME OR PLAN EXCEPTION

Generally, South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged. *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). *See also* Rule 404(b), SCRE (evidence of other crimes, wrongs, or acts is not admissible to prove character of person in order to show action in conformity therewith). The purpose of excluding evidence of prior crimes

or other bad acts is to ensure a defendant is convicted, not based upon the other bad act, but upon the present offense with which he is charged. *State v. Johnson,* 314 S.C. 161, 442 S.E.2d 191 (Ct.App.1994). Such evidence is admissible, however, when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or the identity of the perpetrator. *Lyle,* 125 S.C. at 416, 118 S.E. at 807; *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App. 1999); Rule 404(b), SCRE.

Evidence of subsequent bad acts, not just prior bad acts, is admissible under Rule 404(b), SCRE. *See United States v. Whaley,* 786 F.2d 1229 (4th Cir.1986); *United States v. Hadaway,* 681 F.2d 214 (4th Cir.1982). If not the subject of a conviction, proof of other bad acts must be clear and convincing. *State v. Pierce,* 326 S.C. 176, 485 S.E.2d 913 (1997); *Weaverling,* 337 S.C. at 468, 523 S.E.2d at 791. *See also State v. Beck,* 342 S.C. 129, 536 S.E.2d 679 (2000)(if defendant was not convicted of prior crime, evidence of prior bad act must be clear and convincing).

In the case of the common scheme or plan exception under *Lyle,* a close degree of similarity or connection between the other bad act and the crime for which the defendant is on trial is necessary. *See State v. Cutro,* 332 S.C. 100, 504 S.E.2d 324 (1998); *State v. Timmons,* 327 S.C. 48, 488 S.E.2d 323 (1997). The relationship between the acts must have established such a connection between them as would logically exclude or tend to exclude the possibility that the present crime could have been committed by another person. *State v. Rivers,* 273 S.C. 75, 254 S.E.2d 299 (1979).

The question is whether the particular item of evidence tends to show the existence, the nature, or the content of the plan. *State v. Anderson,* 253 S.C. 168, 169 S.E.2d 706 (1969). Much of the showing is evidence of the conduct of the defendant, and the specific question becomes whether the particular conduct circumstantially tends to prove the design or plan. *Id.* at 181–82, 169 S.E.2d at 712. To be admitted, evidence of other crimes must be logically relevant to the crime charged. *See Cutro,* 332 S.C. at 103, 504 S.E.2d at 325. *See also State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001)(record must

support a logical relevance between other bad act and crime for which defendant is accused); *State v. Smith*, 337 S.C. 27, 522 S.E.2d 598 (1999)(other bad acts evidence must be logically relevant to particular purpose or purposes for which it is sought to be introduced).

Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. All relevant evidence is admissible, unless constitutionally, statutorily, or otherwise provided. Rule 402, SCRE. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE.

The trial judge must balance the probative value of the evidence of other crimes or bad acts against its prejudicial effect. *State v. Parker*, 315 S.C. 230, 433 S.E.2d 831 (1993). Where the evidence is of such a close similarity to the charged offense that the other bad act enhances the probative value of the evidence so as to overrule the prejudicial effect, it is admissible. *See State v. Raffaldt*, 318 S.C. 110, 456 S.E.2d 390 (1995). Even if the evidence is clear and convincing and falls within a *Lyle* exception, the judge must exclude it if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996); Rule 403, SCRE.

In *State v. Caskey*, 273 S.C. 325, 256 S.E.2d 737 (1979), our Supreme Court addressed the common scheme or plan exception to *Lyle*. William Caskey, a Lexington attorney, and Luther Pender, a former Lexington County magistrate, were indicted for obstruction of justice and conspiracy to obstruct justice. The charges grew out of a DUI second charge against Virgil Kilgoar which was allegedly dismissed after Kilgoar paid Caskey $800. At trial, the State presented evidence involving Kilgoar's stepson, who was arrested for DUI on a separate occasion and whose charges were allegedly dropped after the payment of money to Caskey.

On appeal, Caskey asserted the trial court erred in admitting evidence of his alleged wrongdoing in an independent case. The Court held:

While evidence of the commission by an accused of another crime is generally inadmissible, one recognized exception to this rule is when the evidence is admitted to show a common scheme.

Recently, in *State v. Rivers,* [273 S.C. 75], 254 S.E.2d 299 [(1979)], this Court quoted approvingly the following language from *State v. Lyle,* 125 S.C. 406, 417, 118 S.E. 803 (1923):

> "Whether the requisite degree of relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors. Hence, if the Court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected."

While in *Rivers, supra,* the connection between the two alleged crimes was held to be too tenuous to permit the admission of evidence of the prior alleged incident, here, the two alleged crimes were so closely related as to leave little doubt of the former incident's logical relevancy. Therefore, we conclude the trial court correctly admitted the evidence of another crime to show a common scheme.

*Caskey,* 273 S.C. at 328–29, 256 S.E.2d at 738 (citations omitted)(emphasis omitted).

The Supreme Court found evidence of prior crimes admissible under the common scheme or plan exception in *State v. Woomer,* 276 S.C. 258, 277 S.E.2d 696 (1981), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991). On February 20, 1979, Ronald Woomer and Gene Skaar left West Virginia and drove to Myrtle Beach. The two men concocted a scheme with a local coin shop owner, who agreed to identify local coin collectors for Woomer and Skaar so they could rob the collectors and sell the coins to the shop owner. Although Woomer apparently had never before participated in this scheme, he had been expressly told by Skaar, prior to departing from West Virginia, that the purpose of the trip was to make money by robbing people. Woomer understood beforehand that no victims were to remain alive.

On February 22, Woomer and Skaar drove to John Turner's home in Colleton County and stole his coin collection. Woomer killed him by shooting him in the head. On the way back to their motel, Woomer and Skaar stopped at another home and robbed the residents of money and firearms. The occupants, a man, woman, and young child, were all shot in the head and killed by several blasts from Woomer's shotgun. Driving back toward Myrtle Beach, Woomer and Skaar stopped at Jack's Mini–Mall and decided to rob it. After taking money from the cash register, the men took two female employees hostage. The men raped the two women. Woomer then shot both women. Although one of the women died, the second victim survived and testified at trial.

During the guilt phase of the trial, the State sought to introduce evidence of the other killings committed by Woomer just prior to the episode at Jack's Mini–Mall. The State argued the evidence tended to identify and place Woomer at Jack's Mini–Mall and show a common scheme on Woomer's part to dispose of all victims. The evidence was admitted over defense counsel's *Lyle* objection. The Court explained:

> The plan or design which the State sought to show was that Woomer and Skaar left West Virginia intending to come to South Carolina, make money by robbery, and dispose of all victims. A photograph and driver's license of one of the robbery victims were found in the motel room of Skaar and Woomer. Their admission into evidence, along with testimony that this victim had been shot and killed, was proper since it was used to show the existence and commission of a preconceived plan and tended strongly to implicate Woomer as a participant. The scheme and Woomer's participation in it were later confirmed at trial by the taped confession of Woomer himself. In that confession, Woomer explained his involvement with Skaar, their scheme to rob and dispose of witnesses, and the actual execution of that scheme, including the robbery and killing of the victim from whom the photograph and driver's license were taken.

*Woomer*, 276 S.C. at 266, 277 S.E.2d at 700.

The Court of Appeals discussed the common scheme or plan exception in *State v. Moultrie*, 316 S.C. 547, 451 S.E.2d 34 (Ct.App.1994). On June 15, 1991, Ricky Dean Fabre gave

Deputies Joseph Boykin and Ronald Maugans a detailed account of drug transactions involving cocaine, crack cocaine, and marijuana that David Moultrie regularly conducted in front of his house since 1989. Fabre acquired the information that he gave the officers from personal experience. Fabre told the deputies Moultrie kept drugs in a brown paper bag either under his car in front of his house or in the woods adjacent to his house near where he parked his car.

On June 17, 1991, at 10:00 p.m., the two deputies pulled up on the road in front of Moultrie's house. Deputy Boykin observed a crowd of about eight people around a car parked in front of the house. He recognized Moultrie, who was standing in front of the car, from prior encounters. As Deputy Boykin approached the crowd, lighting his way with a small flash light, he saw on the ground, approximately one to two feet from Moultrie, a plastic-wrapped package of marijuana. Further, Deputy Boykin discovered cocaine, crack cocaine, and more marijuana in a brown paper bag at the edge of the woods, ten to fifteen feet from Moultrie's car.

In a pretrial motion *in limine,* Moultrie challenged the admission of "any evidence of prior crimes which did not result in any conviction." In arguing the motion, Moultrie focused entirely on Fabre's testimony concerning Moultrie's involvement since 1989 in the drug trade. The Circuit Court judge found the testimony admissible to prove a common scheme. In affirming the judge's ruling,[5] this Court stated:

> Fabre's testimony relating the specifics of Moultrie's mode of operation when conducting prior drug deals bore an extraordinary similarity to the evidence Deputy Boykin discovered on the night of Moultrie's arrest and tended to show the nature and content of Moultrie's previous drug dealing. This testimony was, therefore, admissible to prove the existence and nature of Moultrie's drug trafficking scheme and was probative of Moultrie's conduct with respect to the crime for which he was on trial.

*Moultrie,* 316 S.C. at 555, 451 S.E.2d at 39 (footnote omitted).

Evidence of prior bad acts was admitted in *State v. Raffaldt,* 318 S.C. 110, 456 S.E.2d 390 (1995), to prove the existence of a

---

5. Initially, the Court of Appeals ruled the issue as to the admission of prior bad acts testimony was not preserved. Yet, noting the outcome was the same, the Court addressed the merits.

common scheme or plan. Raffaldt was charged with trafficking in cocaine. The indictment alleged Raffaldt, along with Jesus Jiminez, William Kelly, Richard Smith, Michael Hayes, and Edward Burchett, conspired to bring one hundred grams or more of cocaine into the state from December of 1989 to March 14, 1991.

At trial, Jiminez testified he would transport cocaine from New York to various locations in South Carolina, where he would sell it to Kelly. Specifically, on January 30, 1991, Jiminez bought a kilogram of cocaine from New York. He met Kelly in Pageland, South Carolina, and gave him the cocaine. Kelly, along with Burchett, delivered the cocaine to Raffaldt at his house, at which time Raffaldt gave Kelly $26,000. Kelly then returned to Pageland and paid Jiminez $25,000. Kelly, Burchett, and Hayes all corroborated Jiminez's account of the sale of January 30, 1991. Additionally, Kelly testified he first met Raffaldt in early 1990 at a rooster fight. Shortly thereafter, Kelly sold him four ounces of cocaine. After two similar transactions in 1990, they arranged for the sale and purchase of the kilogram on January 30, 1991.

Burchett stated he has known Raffaldt all his life. He began purchasing quantities of marijuana from Raffaldt in 1990 and, occasionally, also bought small amounts of cocaine. In 1991, Burchett set up cocaine deals between Kelly and Raffaldt. He corroborated the other witnesses' account of the kilogram deal of January 30, 1991.

During direct examination of Kelly and Burchett, the State presented evidence that, beginning in 1990, Raffaldt sold marijuana to Burchett, who, in turn, sold it to Kelly. Raffaldt objected to the admission of this testimony. The trial court held the evidence of marijuana dealing by Raffaldt was admissible under *Lyle* since it indicated a common scheme or plan. The Court articulated:

Here, the record shows that the method of marijuana dealing between Raffaldt and Burchett was quite similar to the cocaine conspiracy. We find that the evidence of prior drug dealing between Raffaldt and Burchett, which gave rise to the cocaine transactions, was admissible as a common scheme or plan. *See State v. Hammond,* 270 S.C. 347, 242 S.E.2d 411 (1978) (possession of marijuana is relevant to

possession with intent to distribute cocaine); *State v. Moultrie,* 316 S.C. 547, 451 S.E.2d 34 (Ct.App.1994)(defendant's prior involvement in drug trade admissible to prove nature and existence of marijuana trafficking); *U.S. v. Rawle,* 845 F.2d 1244 (4th Cir.1988)(defendant's prior drug dealings admissible to show common scheme or plan).

*Raffaldt,* 318 S.C. at 114, 456 S.E.2d at 392.

In *State v. Patrick,* 318 S.C. 352, 457 S.E.2d 632 (Ct.App. 1995), the Court of Appeals examined the common scheme or plan exception. Charles Patrick was convicted of burglary, armed robbery, assault with intent to kill, and use of an automobile without permission. On appeal, Patrick argued the trial judge improperly allowed the State to introduce evidence of a subsequent crime in Georgia. This Court explicated:

> In both the Georgia case and the [current] case, the suspects used the same disguises (gloves, wigs, bandannas) and the same tools (walkie-talkies, flashlights). They cut telephone lines in the same manner [a portion of the wire was removed-rather than simply cut]. They generally carried the same type of weapons. There are sufficient similarities between the Georgia case and the present case to apply the *Lyle* common scheme or plan exception. Moreover, here the probative value of that evidence outweighed its prejudicial effect.

*Patrick,* 318 S.C. at 356, 457 S.E.2d at 635.

*State v. Aiken,* 322 S.C. 177, 470 S.E.2d 404 (Ct.App.1996), is particularly instructive regarding the common scheme exception. Donnie Aiken was found guilty of armed robbery. On appeal, he claimed the trial court erred in admitting evidence of his participation in other robberies. This Court concluded:

> Here, [the] testimony concerning Aiken's other bad acts was probative on the issue of whether all of the robberies were part of a common scheme or plan. The evidence showed all of the robberies took place in the same month in the same part of Orangeburg, all either on or near the Highway Twenty–One bypass. Additionally, each robbery was perpetrated by a young, black gunman with his face concealed.

. . . .

... We therefore hold the trial court did not abuse its discretion in allowing the testimony of Aiken's participation in the other robberies.

*Aiken,* 322 S.C. at 181, 470 S.E.2d at 406–07.

Likewise, the case of *State v. Ford,* 334 S.C. 444, 513 S.E.2d 385 (Ct.App.1999), is enlightening. On December 17, 1995, Theodore Wells was robbed of $200 at gunpoint by Derrick Ford and Anthony Brown. During the defendants' trial for common law robbery and criminal conspiracy, the Solicitor sought to admit Wells's testimony that Ford and Brown robbed him at gunpoint in August of 1995, telling him that they would shoot him in the head if he did not give them $200 every time he saw them. Wells further testified Ford and Brown attempted to rob him again in October of 1995. The trial judge ruled the evidence could be admitted as *res gestae* or under the *Lyle* exceptions of motive, intent, and common scheme or plan. The jury found the defendants guilty of both charges.

Ford appealed maintaining the trial judge erred in allowing testimony about other bad acts. The Court of Appeals determined:

In the present case, the fact that Ford and Brown had previously robbed or attempted to rob Wells was a necessary element in understanding their motive and intent when they accosted Wells on December 17, 1995. The statement that Wells should be prepared to give money to the defendants each time he saw them was, in particular, so closely related to the criminal conspiracy charged that proof of the statement tends to establish the existence of a common plan and, thus, of the conspiracy. The previous robbery and attempted robbery also were so similar to the incident for which Ford and Brown were charged that they tend to establish both the existence of a common plan and the fact that the plan was being carried out. *Cf. State v. Raffaldt,* 318 S.C. 110, 456 S.E.2d 390 (1995)(holding evidence of marijuana dealing by the defendant in prosecution for trafficking in cocaine was admissible as indicative of a common scheme or plan); *State v. Moultrie,* 316 S.C. at 555, 451 S.E.2d at 39 (holding evidence of defendant's prior drug

deals was admissible to prove existence and nature of marijuana trafficking scheme).

*Ford,* 334 S.C. at 452, 513 S.E.2d at 389 (citations omitted).

Evidence regarding other crimes was admitted to establish a common scheme or plan in *State v. Kennedy,* 339 S.C. 243, 528 S.E.2d 700 (Ct.App.2000). The charges against Thomas Kennedy arose out of an early evening residential burglary at the home of Sandra York and the use of an ATM card taken from the home. At trial, the State presented evidence that Kennedy committed similar burglaries at the homes of David Odle, Jack Pfeiffer, and Dr. Tan Platt and that he used or attempted to use bank and credit cards he took from these homes. Kennedy was convicted of first degree burglary, grand larceny, and financial transaction card fraud.

On appeal, Kennedy claimed the court erred in allowing extensive testimony and other evidence concerning his involvement in three other burglaries and related financial transaction card fraud offenses. The Court emphasized:

We conclude the trial court properly allowed evidence of Kennedy's involvement in each of the other burglaries and fraudulent use of the cards taken from the homes. The crimes were very similar to the crimes for which Kennedy was tried. Each of the four burglaries occurred within a three month time span. The Odle and Pfeiffer homes were in the same area of town as York's home. Each burglary occurred during a weekday in the early evening hours between 6:00 and 8:00 p.m., the residents having all left their homes between 6:10 and 6:30 p.m. In each burglary, the master bedroom was the targeted room and only small, portable items were taken, while larger items such as televisions and VCR's were undisturbed. Items which held some of the smaller things taken from several of the homes, including safes, a briefcase, and a humidor, were discarded outside somewhere near the residences. The stolen credit or ATM cards taken from each home were used shortly after the burglaries, and almost immediately after in the Odle and Platt cases, as well as the present case.

We find the evidence of the other burglaries and credit card fraud was logically relevant to the crimes charged and was proven by clear and convincing evidence. Further, the

other crimes were not of just a general similarity, but were so closely connected to the crimes charged that the similarity enhanced the probative value of the evidence to the extent that it outweighed any prejudicial effect. Accordingly, we find no error.

*Kennedy,* 339 S.C. at 248–49, 528 S.E.2d at 703.

A raft of criminal sexual conduct (CSC) cases is extant in regard to the common scheme or plan exception. *See, e.g., State v. Hallman,* 298 S.C. 172, 379 S.E.2d 115 (1989)(testimony of three young women regarding sexual abuse allegedly perpetrated by foster father was admissible in his trial for first degree CSC and attempting to commit lewd act upon minor foster child; prior acts occurred while each of the young women was foster child and of similar age to victim, foster father took advantage of relationship for sexual gratification in each instance, and abuse commenced in exactly same manner under similar circumstances); *State v. McClellan,* 283 S.C. 389, 323 S.E.2d 772 (1984)(victim's testimony regarding prior attacks upon her by defendant was admissible under common scheme exception in order to show continued illicit intercourse forced upon her by defendant); *Id.* (testimony of defendant's daughters concerning his prior misconduct with them was admissible under common scheme or plan exception where experiences of each daughter paralleled that of her sisters, one of whom was the prosecuting victim); *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999)(in prosecution for CSC with a minor and disseminating harmful material to a minor, victim's testimony regarding pattern of sexual abuse he suffered by defendant was properly admitted under common plan or scheme exception where testimony showed the same illicit conduct with same victim under similar circumstances over a period of years); *State v. Adams,* 332 S.C. 139, 504 S.E.2d 124 (Ct.App.1998)(testimony of one stepdaughter that she was molested by defendant at least once a week for eight years was admissible, in prosecution for sexual abuse of other stepdaughter, to establish common plan or scheme, where defendant used his relationship as stepfather to control both stepdaughters, and defendant engaged in similar conduct as to each stepdaughter); *State v. Wingo,* 304 S.C. 173, 403 S.E.2d 322 (Ct.App.1991)(testimony of child sexual abuse victim's twelve year old female cousin that defendant had also sexually

assaulted victim's twelve year old sister using methods almost identical to those that nine year old victim testified defendant subsequently employed when he sexually assaulted her tended to show common scheme or plan).

In the case *sub judice,* there are sufficient similarities between the charged offense and the subsequent act to apply the *Lyle* common scheme or plan exception. The evidence regarding the package delivered to Seruya's house was clear and convincing. Such evidence established the existence of a common scheme or plan. Further, the probative value of Seruya's testimony was so great, considering the close degree of similarity between the packages, it substantially outweighed any prejudice to the Humphries. *See State v. Gilchrist,* 329 S.C. 621, 496 S.E.2d 424 (Ct.App.1998)(unfair prejudice does not mean damage to defendant's case that results from legitimate probative force of evidence; rather it refers to evidence which tends to suggest decision on an improper basis). Because the testimony about the package delivered to Seruya's residence was relevant to the existence of a common scheme or plan, was clear and convincing, and was more probative than prejudicial, the trial judge did not err in admitting the testimony under Rule 404(b), SCRE, and *State v. Lyle.*

The majority relies on *State v. Carter,* 323 S.C. 465, 476 S.E.2d 916 (Ct.App.1996), and *State v. Campbell,* 317 S.C. 449, 454 S.E.2d 899 (Ct.App.1994), in reaching its conclusion the court erred in allowing the testimony regarding the subsequent bad act. *Carter* and *Campbell* are inapposite. Facially, factually and legally, these cases involve evidence of *prior drug sales.* By no stretch of the imagination does the instant case relate to *prior drug sales.*

The decision to admit contested evidence rests within the sound discretion of the trial judge. *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999). The ruling will not be disturbed absent prejudicial abuse of discretion. *State v. Needs,* 333 S.C. 134, 508 S.E.2d 857 (1998). In the case at bar, the judge properly admitted the evidence regarding subsequent bad acts.

In determining the admissibility of bad act evidence, this Court does not re-evaluate the facts based on its own view of the preponderance of the evidence. We merely determine

whether the trial judge's ruling is supported by *any* evidence. *See State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001). Here, the opinion of the majority is violative of *State v. Wilson.* Indubitably, the majority used the wrong standard in determining admissibility because the majority weighed the evidence rather than reviewing the evidence presented at trial. Because there is evidence to support the admission of the bad act evidence in this case, I would AFFIRM the rulings of the trial judge and the convictions of Claude and Phil Humphries without resorting to a harmless error analysis.